253 N.J. Super. 626 (1992)
602 A.2d 789
COSKEY'S TELEVISION & RADIO SALES AND SERVICE, INC., D/B/A COSKEY'S ELECTRONIC SYSTEMS, PLAINTIFF-RESPONDENT,
v.
RONALD J. FOTI AND SYSTEMS SALES, INC., DEFENDANT-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1992.
Decided February 19, 1992.
*628 Before Judges KING, DREIER and BROCHIN.
Alan J. Karcher argued the cause for appellant Ronald J. Foti (Donington, Karcher, Leroe, Salmond, Luongo, Ronan, & Connell, attorneys; John C. Castellano, of counsel and on the brief).
Guy P. Ryan argued the cause for appellant Systems Sales, Inc. (Giordano, Halleran & Ciesla, attorneys; Guy P. Ryan, on the brief).
*629 Ronald Reich argued the cause for respondent (Miller & Littman, attorneys; Arthur H. Miller, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant, Ronald J. Foti appeals by leave granted from an amended preliminary injunction entered against him in the Chancery Division. The injunction was based upon a restrictive covenant ancillary to an employment agreement signed by Foti in favor of plaintiff, Coskey's Television & Radio Sales and Service, Inc., d/b/a/ Coskey's Electronic Systems (Coskey's). Codefendant, System Sales, Inc., Foti's subsequent employer, has joined in his application. We here determine that the preliminary injunction was overbroad and, considering the apparent extreme hardship worked upon Foti in the months pending this review, fairness dictates that it should be substantially vacated forthwith.
Coskey's sells and services communication systems in New Jersey, with annual sales of between three and four million dollars. Most of its customers are public institutions, but a substantial number of sales are with private companies. Its business is generated through contacts with architects, engineers and other professionals who specify Coskey's products in proposed projects. Furthermore, Coskey's sales personnel often help with the design aspects of the proposed systems in the hope of receiving orders from the contractor, should the contractor win the bid on the pending project. The codefendant, Systems Sales, and most other competitors in the industry operate in the same manner.
Prior to July 1987 Foti was an employee of and a 10% shareholder in High Fidelity Sound Center Corp., then a competitor of Coskey's and System Sales, and similarly operating. Foti at that time had over 25 years of experience in the industry and had built up a network of contacts with most of the architects, engineers and contractors designing structures requiring *630 substantial sound systems. While the moving papers before the trial judge did not quantify the precise number of individuals or entities with whom Foti had personal contacts, we were informed at oral argument that the list which was prepared to implement the eventual restraining order enumerated well over 100 prohibited contacts.
The contracts of sale under which Coskey's purchased High Fidelity Sound Center Corp. revealed that the assets of the seller were purchased, and Coskey's retained certain employees of High Fidelity Sound Center Corp. and two principals (Harold Ducore and Bernard Martin) as consultants. The initial agreement of July 1, 1987 was superseded by two agreements of November 16, 1987, which although slightly different in form, have the same effect upon Foti. In the consulting agreement to which Foti was not a signatory, Coskey's as the "Employer," agreed as follows:
10. Employer agrees to make the following payments to the following individuals:
* * * * * * * *
C. $11,250.00 to Ronald J. Foti upon his signing of an employment agreement and waiver of his right to first refusal to purchase High Fidelity Sound Center.
The agreement further provided that Ducore and Martin were each to receive $45,000 upon their signing the principal agreements which contained a covenant not to compete. A fourth principal, Arthur Thompson, was to receive $11,250, to be held in escrow and distributed quarterly during his employment with Coskey's over a five-year period, contingent upon his signing a waiver of his right of first refusal to purchase High Fidelity Sound Center. At the time the purchase and employment agreements were signed to transfer High Fidelity Sound Center Corp., Foti had already on November 12, 1987 signed his waiver of first refusal which stated:
I, Ronald J. Foti, hereby waiver [sic] right of first refusal for purchase of High Fidelity Sound Center. In consideration thereof, Coskey's Electronic Systems will pay $11,250.00 to me.
*631 Foti had on October 27, 1987 already signed an employment contract with Coskey's. It covered a five-year period commencing October 1, 1987 and provided for an annual salary of $53,000 plus commissions and benefits. It contained extensive covenants not to compete:
6. During the term of this agreement the Employee shall not, directly or indirectly, either as an employer, employee, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of the Employer.
7. The Employee covenants and agrees as follows:
On the termination of employment, whether by termination of this agreement, by wrongful discharge, or otherwise, the Employee shall not directly or indirectly within the existing marketing area of the Employer, or any future marketing area of the Employer begun during the employment under the terms of this agreement, enter into or engage generally in direct competition with the Employer either as an individual on his own, or as a partner or joint venturer, or an employee or agent for any person, or as officer, director or shareholder or otherwise, for a period of three (3) years after the date of termination of his employment under this agreement. This covenant on the part of the Employee shall be construed as an agreement independent of any other provision of this agreement; and the existence of any claim or cause of action of the Employee against the Employer, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by the Employer of this covenant.
8. This agreement shall be construed to allow Employee, after termination of employment with Employer, to act as a consultant in the sound engineering field provided any consulting services performed by Employee shall not be for persons who are competitors of Employer and provided further Employees consulting services are not in competition with the consulting services performed and or provided by Employer.
On January 4, 1991, after dissatisfaction with his treatment at Coskey's, Foti asserted by letter that Coskey's had breached its agreement with him, and resigned. Five days later Coskey's replied, contending that there had been no breach on its part. It informed Foti that it would enforce its covenant not to compete, and demanded that Foti comply with the provisions of the employment agreement. On February 1, 1991, Coskey's attorneys applied for and received an order to show cause incorporating a preliminary injunction prohibiting Foti:
(a). from directly or indirectly either on his own behalf or on behalf of any other person or firm contacting for business purposes any of the architects, engineers, contractors, or customers with whom he dealt with [sic] on behalf of *632 Plaintiff between October 27, 1987 and January 4, 1991 in the State of New Jersey.
By order dated October 22, 1991 the preliminary injunction was amended so that Foti was
restrained from and hereby forbidden to have, directly or indirectly, either on his own behalf or on behalf of any other person or firm, any contact, including but not limited to, contact by telephone, telefax, in person, mail, telegraph, video or radio transmission, or by any other means of communication, regardless of who initiates or requests said contact, with all or any architects, engineers, designers, contractors, subcontractors, customers, clients, or other business persons or companies with whom Foti had "meaningful contact" (as hereinafter defined in paragraphs 2, 3 and 4 of the within Order), during the period of October 27, 1987 through January 4, 1991 when Foti was employed by plaintiff.
The term "meaningful contact" was defined in the order as contacts "which at a bare minimum led to the submission of bids to those business entities or consummation of contracts with those business entities." The term excluded mass mailings, telephone or mail solicitations, meetings at trade shows or conventions or like incidental contacts. The October order further specifically noted that Foti could participate in competitive public bidding by preparing specifications or supporting documents provided that Foti did not have personal contact with individuals at the public entities. As to nonpublic entities, he was also permitted to prepare specifications, bids and supporting documents without personal contact. The scope of the order was limited to the State of New Jersey.
At the time of the enforcement proceedings, Foti had 31 years of experience in the field. While not a graduate engineer, Foti had built up a personal reputation for working with customers to design the components of commercial sound systems. Plaintiff claims that Foti has not been deprived of his livelihood by this injunction, since it permits him to work as a "inside man." He could draft specifications and prepare bidding documents. Foti was not trained by experience nor inclined to do this type of work, and during the period of the *633 injunction it yielded nowhere near the remuneration of his regular employment. The issue before us, therefore, is whether, given the background of the parties to this transaction, Foti should have been deprived by a preliminary injunction of his principal livelihood pending the resolution of this dispute.[1]
Plaintiff contends that we should treat the covenant in this case as one ancillary to the purchase of a business, rather than ancillary to an employment contract. Such covenants ancillary to the sale of a business are accorded far more latitude. For example, if a retail store is purchased at a particular location, the seller receives payment for the good will generated at that location, recognizing that customers would be inclined to continue shopping at the facility. See Heuer v. Rubin, 1 N.J. 251, 256, 62 A.2d 812 (1949). For the seller to thereafter trade on that good will by reopening within the competitive area would destroy the essence of the transaction.
Restrictive covenants ancillary to an employment contract are different and far more complex. Our courts have only enforced such contracts insofar as they are reasonable under the circumstances. Solari Industries, Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970). Solari is the seminal case *634 establishing the modern New Jersey enforceability standards concerning covenant not to complete in the employment setting. It established a three-prong test of reasonableness. To be enforceable the covenant must protect a legitimate interest of the employer; it may impose no undue hardship on the employee; and it must not impair the public interest. Id. at 576, 585, 264 A.2d 53. Even if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity. Id. at 585, 264 A.2d 53.
In this case, the trial judge did trim or "blue pencil" the covenant in its scope of activity and area of enforceability. We determine, however, that a full analysis of the legitimate interest of the employer and the harm visited upon the employee required substantially narrower enforcement.
We will first dispose of Foti's argument that since many of his contacts involved preparing bids for public agencies, depriving him of input had the potential of raising the costs to these public agencies. He contended at oral argument that he had a special reputation for devising less expensive ways to provide desired results. Thus he asserted that the trial court failed adequately to consider the "public interest" factor of the Solari test. We reject this view. While it is always possible that any individual working on the specifications to be incorporated in a bid for a public job could devise ways to hold down costs, such nebulous possibilities would generally be insufficient to satisfy the public interest test.
Since we see no major public component in this case, we refrain from an extended discussion of those cases primarily concerned with the rights of the public to have free access to the advice of professionals licensed by the State. See Karlin v. Weinberg, 77 N.J. 408, 390 A.2d 1161 (1978) (physicians); Dwyer v. Jung, 133 N.J. Super. 343, 336 A.2d 498 (Ch.Div. 1975), aff'd o.b., 137 N.J. Super. 135, 348 A.2d 208 (App.Div. 1975) (attorneys); Mailman, Ross, Toyes & Shapiro v. Edelson, 183 *635 N.J. Super. 434, 444 A.2d 75 (Ch.Div. 1982) (certified public accountants). All of these cases recognize that the employer had legitimate patient or client relationships at stake, yet balancing these against the needs of the public required treatment in each situation tailored to the particular profession. We are also not here dealing with the direct submission of public bids where the only question is which applicant is the lowest responsible bidder. See Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 38, 274 A.2d 577 (1971). In such a case absent other trade secrets of the employer to be protected, restrictive covenants are seldom enforced. Id. at 33-34, 274 A.2d 577. We therefore will concentrate on the other two Solari factors.
The question of whether the enforcement of this covenant imposed an undue hardship on Foti is one of the primary factors supporting our decision. We distinguish the case before us from one where a proprietor of or stockholder in a business has sold his interest for a substantial purchase price and has only an incidental ensuing employment agreement with the new entity. The Heuer standard discussed earlier does not apply here. The $11,250 received by Foti was paid to him for his right of first refusal to purchase the business and for his employment contract which contained the covenant not to compete.[2] If we assume that Foti's annual salary at Coskey's was fair, and we see no indication to the contrary, it would be unreasonable for us to say that the parties intended that an $11,250 payment was to compensate Foti for the potential three-year loss of a $53,000 per year salary, plus commissions and benefits.
*636 Of course Foti was always free to uproot his family and move elsewhere to continue his employment, giving up the contacts that he had personally developed over 31 years, but this was neither a fair nor a viable alternative. Enforceability of such a covenant would make Foti little more than a highly-paid indentured servant. Substantially all of Foti's contacts were built up over the years before he was plaintiff's employee, and at one time or another during the years he worked with plaintiff they would have contacted him or he would have approached them in order to provide information concerning jobs. Under the trial judge's view of the agreement, with each contact during these few years with Coskey's, Foti would have eroded his ability to earn a living after he left plaintiff's employ. He would be bound to plaintiff by a golden handcuff.
Enforcement of this agreement clearly imposed a hardship upon Foti. The question remains, however, whether this hardship was "undue," when balanced against the legitimate interest of the employer. What rights could Coskey's legitimately protect? The cases principally deal with trade secrets, confidential business information and customer relationships. See Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 628, 542 A.2d 879 (1988); Whitmyer Bros. v. Doyle, supra 58 N.J. at 33, 274 A.2d 577; Raven v. A. Klein & Co., Inc., 195 N.J. Super. 209, 213-214, 478 A.2d 1208 (App.Div. 1984); Mailman, Ross, Toyes & Shapiro v. Edelson, supra, 183 N.J. Super. at 440, 444 A.2d 75. However, the principal thrust of an enforceable covenant may not be its anticompetitive effect. As noted in Ingersoll-Rand:
[I]n cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable.
110 N.J. at 635, 542 A.2d 879.
Certainly, there are no trade secrets involved in this case. The solicitation of bids for major projects is known generally throughout the industry. The products available are similarly known and it is the skill in combining the two and *637 presentation of the material that determines to whom contracts will be awarded. An employer may not prevent an employee from using the general skills in an industry which have been built up over the employee's tenure with the employer. Whitmyer Bros., Inc. v. Doyle, supra 58 N.J. at 33-34, 37, 274 A.2d 577. What then are the "customer relationships" that can be protected by plaintiff? It is fair to say that if Foti successfully negotiated a contract for a particular engineer whose proposals were accepted in a public works or private industrial project, and if there was to be a subsequent modification of that project, Foti's employer would have a right to protect its contractual relationship. Foti takes no issue with this proposition. His counsel at oral argument stated that he would voluntarily accept such a limitation. Furthermore, if Foti had not previously dealt with a particular engineer, architect, or entity prior to his employment with plaintiff, and plaintiff was instrumental in cementing the relationship between Foti and his new contact, it might be fair to prevent Foti from utilizing this contact during the covenant period.[3]
Foti worked on hundreds of proposals which resulted in unsuccessful bids. Such efforts were part of the everyday work not only of plaintiff, but also of all its competitors, and it was unfair to make such contacts the triggering actions to warrant injunctive relief. The trial judge's definition of "meaningful contact" placed too great a restriction on Foti's actions. What Foti brought to his employer, he should be able to take away. This is little different than the tradesman who brings his tools to his employer and upon separation leaves with them, *638 or a scientist who has entered into an employment relationship with a head full of scientific data which he used for the benefit of his employer and then may use for the benefit of another upon reemployment. "Princeton is not to have the exclusive right to Einstein's services just because he is Einstein." Corbin, Contracts, § 1391B, at 610 (Supp. 1989). Foti's relationships within the industry were not bought and paid for; they were merely rented during the period of employment. Barring any additional facts that may be disclosed at the eventual trial of this case, we see no basis for the broad restrictions imposed upon Foti.
Our conclusion in this case does not depart from the well-reasoned opinion of A.T. Hudson & Co., Inc. v. Donovan, 216 N.J. Super. 426, 524 A.2d 412 (App.Div. 1987), where the employee was prohibited from soliciting business from a customer of a consulting firm. There we determined that the trial judge had given "too little consideration to the significant business interest of plaintiff which the covenant was designed to protect." Id. at 433, 524 A.2d 412. Further, we noted that the record presented considerable "evidence indicating that consulting firms expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff was able to attract represents a significant investment of time, effort and money which is worthy of protection." Id. at 434, 524 A.2d 412.
What is significant, however, is that the consulting and sales businesses in A.T. Hudson and in the case before us are significantly different, as were the industry relationships already possessed by Donovan (the employee in A.T. Hudson) and Foti in our case. In A.T. Hudson, the consulting firm effected reorganization of the management of its clients' businesses. The relationships were ongoing, and involved "close contact between the consultants and the management employees of the client." Id. at 433, 524 A.2d 412. The business in the case before us involves discrete projects, with many bids and proposals being developed which the parties realize may *639 never result in a contract, and where the customers are a finite group dealt with by all competitors in the field. The employee in A.T. Hudson, a management consultant, could have dealt with any entity in the country, yet chose a division of his former employer's major customer. The circumstances here are therefore eminently distinguishable. In fact, in accordance with A.T. Hudson, we have indicated that we would sustain so much of the order that restrains Foti from interfering with any ongoing contract, including any modifications thereof, in which he had participated on behalf of Coskey's during his employment.
We have not lost sight of the fact that we are reviewing this matter by an interlocutory appeal of a preliminary injunction. In such a situation plaintiff must be threatened with irreparable harm if the injunction does not issue. Crowe v. DeGioia, 90 N.J. 126, 132-133, 447 A.2d 173 (1982); Citizens Coach Co. v. Camden Horse R.R. Co., 29 N.J. Eq. 299, 303-304 (E. & A. 1878); R. 4:52-1, 2. Furthermore, the plaintiff must demonstrate that there is a reasonable probability of eventual success on the merits. Zoning Bd. of Adj. of Sparta Tp. v. Service Elec. Cable Television of New Jersey, Inc., 198 N.J. Super. 370, 379, 487 A.2d 331 (App.Div. 1985). "An interlocutory injunction is an extraordinary equitable remedy utilized primarily to forbid and prevent irreparable injury, and it must be administered with sound discretion and always upon consideration of justice, equity, and morality in a given case." Ibid.
The preliminary injunction in this case had obvious devastating effects upon Foti, and only limited (and mainly financial) effects upon plaintiff. See Crowe v. DeGioia, supra, 90 N.J. at 132-133, 447 A.2d 173. As noted earlier, some areas of competition may have required protection. During what should have been a brief period between the initial order and eventual trial, it appears that the maximum relief to which plaintiff would be entitled, based upon the documents before us, is an order protecting Foti's interference with 1) successful contracts which *640 he negotiated on the part of plaintiff, 2) current outstanding bids of plaintiff in which he participated, and 3) plaintiff's relationships with particular individuals or entities where plaintiff was instrumental in providing the contact for Foti.[4]
Even though such a permissible area of injunctive relief may later be included in an eventual permanent injunction after a full consideration of the merits of this case, we cannot lose sight of the fact that Foti has spent months under the burden of an overbroad preliminary injunction that has reduced him from a well-paid employee of System Sales to a recipient of unemployment benefits. Thus, rather than force both Foti and System Sales to await the terms of an eventual preliminary injunction, we direct Foti's counsel to prepare a form of preliminary injunction limited to the protected areas outlined in this opinion and submit the same to the trial judge under the five-day notice provisions of R. 4:42-1(c). If there is an objection to the form of order, it shall be resolved by the trial judge.[5] Thereafter the trial judge shall enter an order supervising the completion of discovery on an expedited basis and schedule the matter for prompt trial, unless the matter is otherwise resolved by the parties.
NOTES
[1] Foti had claimed that after the filing of the complaint in this matter he was dismissed by System Sales. Just prior to oral argument plaintiff moved to supplement the record to indicate that Foti had in fact submitted a bid on a job on behalf of Systems Sales, and furthermore had been observed at a site inspection and bid meeting. Plaintiff attached a copy of a September 20, 1991 quotation on behalf of System Sales, signed by Foti, and noted that at a November bid meeting and at an early December site inspection Foti had accompanied an employee of System Sales. In a responsive certification, System Sales claimed that Foti remained at the corporation without a salary agreement from mid-September to early December and for that period was paid one-seventh of his regular compensation for the months of October and November, with no payment being made for December. At oral argument it was represented to us that Foti has recently been receiving only unemployment compensation.

Since we are reviewing a preliminary injunction and the current status of the parties is of particular relevance, we will grant the motion and consider the submitted certifications of all of the parties, realizing of course that matters of credibility and the like must eventually be resolved by the trial judge.
[2] It has not been lost upon us that Foti received 10% of the total consideration paid ($112,500), and that he previously owned 10% of the stock in the corporation. Thus it might be viewed that the option had no value. Yet we also note that a minority interest in a closely held corporation might be thought of as having little real value. We are not, however, precluded from looking at the relatively small amount of the payment, even assuming that all of it had been paid for his share in the business.
[3] Extrapolation of such a principle to other cases might be dangerous. For instance, if a young employee joins a company and for 20 years establishes all of his contacts within an industry, but has signed a similar restrictive covenant, such a principle could require that the employee leave the industry or at least the geographical area if he wished to change employers. We therefore limit our discussion of this point to particular individuals with whom Coskey's had a special relationship that was shared with Foti because of his employment by Coskey's.
[4] This does not mean that if Foti had a long-standing relationship with a particular architectural or engineering firm, and the personnel within that firm changed during the period of his employment, the firm or personnel would be subject to the injunction. There must be some favored, personal or other special relationship that plaintiff had with the individual or firm before this injunctive relief could be considered effective.
[5] Although we do not retain jurisdiction of this matter, either party may apply by way of motion for clarification directly to this Part to the end that the parties may proceed with their business and personal lives as soon as possible without uncertainty.