**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-1796 & 18-2603
_____

ADP, LLC,
Appellant

v.

NICOLE RAFFERTY

_____

On Appeal from the District Court
of New Jersey
(D.N.J. No. 2:18-cv-01922)
Honorable Jose L. Linares, U.S. District Judge

_____

ADP, LLC,
Appellant

v.

KRISTI MORK

_____

On Appeal from the District Court
of New Jersey

(D.N.J. No. 2:17-cv-04613)
Honorable Claire C. Cecchi, U.S. District Judge
_____

Argued: September 6, 2018

Before: HARDIMAN, KRAUSE, and BIBAS, *Circuit Judges*

(Opinion Filed: April 26, 2019)

Harris S. Freier
494 Broad Street
Newark, NJ 07102

Timothy J. Lowe          [Argued]
James J. Giszczak
McDonald Hopkins
39533 Woodward Avenue
Bloomfield Hills, MI 48304

   *Counsel for Appellant*

John H. Schmidt, Jr.     [Argued]
Lindabury McCormick Estabrook & Cooper
53 Cardinal Drive
P.O. Box 2369
Westfield, NJ 07091

   *Counsel for Appellees Nicole Rafferty and Kristi Mork*
_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

## I.    Introduction

In this appeal, we must determine whether certain restrictive covenants, which high-performing employees enter into as a condition of a stock award, constitute an impermissible restraint on trade under New Jersey law. We conclude that these restrictive covenants are not unenforceable in their entirety because they serve a legitimate business interest, but they may place an undue hardship on employees because they are overbroad. Accordingly, we will remand for the District Court to consider whether and to what extent it is necessary to curtail the restrictive covenants' scope, which is the approach prescribed by the New Jersey Supreme Court when confronted with overbroad restrictive covenants such as these.

## II.    Factual Background

ADP, LLC (ADP) is a human capital management company that sells technology products and services related to payroll, human resources, benefits, talent management and recruiting to customers worldwide. ADP imposes restrictive covenants on its sales employees[1] in two layers. The first layer, which applies to all employees and includes a Sales Representative Agreement (SRA) and a Non-Disclosure Agreement (NDA) entered into at the time of hire, is a

---

[1] Throughout its briefs, ADP refers to these sales employees interchangeably as sales "associates" and "employees." Hereinafter, for simplicity's sake, we will refer to them as "employees."

condition of employment at ADP. The SRA and NDA prohibit ADP employees from, among other things, soliciting any ADP "clients, bona fide prospective clients or marketing partners of businesses of [ADP] with which the Employee was involved or exposed" for one year after termination. Rafferty JA 42.

The second layer functions differently. High-performing ADP employees who meet their sales targets are eligible to participate in a stock-option award program, but only if they agree to an additional restrictive covenant known as the Restrictive Covenant Agreement (RCA). Participation by eligible employees in the stock option program, in other words, is voluntary but conditioned on their assent to the terms of the RCA. ADP does not attempt to impose the RCA on other employees or in circumstances outside of the stock award program. It is not imposed, for instance, as a condition of initial or continued employment or in connection with other employment milestones such as a promotion or transfer. Nor does it entitle ADP employees to any employment benefits beyond the compensation of the stock option award itself, such as more or different training or access to proprietary information.

The RCA is undisputedly more onerous than the SRA and NDA, and makes it more difficult for former employees bound by its restrictions to compete with ADP upon their separation from the company. Specifically, the RCA contains a strengthened non-solicitation provision (Non-Solicitation Provision), which prohibits employees—for a period of one year following their termination (voluntary or involuntary)—from soliciting any ADP clients to whom ADP "provides," "has provided" or "reasonably expects" to provide business within the two-year period following the employee's

4

termination from ADP. Rafferty JA 78. Thus, unlike the SRA, which only prohibits solicitation of those ADP clients with whom the former employees "w[ere] involved or exposed," Rafferty JA 42, the RCA also prohibits solicitation of all current *and prospective* ADP clients. And while the SRA limits former employees' solicitation of ADP's "marketing partners," Rafferty JA 42, the RCA prevents former employees from soliciting ADP's "Business Partners," which is defined to include "referral partners" in addition to "marketing partners," Rafferty JA 76, 78.[2]

The RCA also contains a non-compete provision that is absent from the SRA and NDA (Non-Compete Provision): For a period of one year following their termination, employees will not "participate in any manner with a Competing Business anywhere in the Territory where doing so will require [them] to [either] provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed," or "use or disclose ADP's Confidential Information or trade secrets." Rafferty JA 78. The term "Territory" is defined as the "geographic area" where the employee worked or had contact with ADP clients in the two years prior to her termination. Rafferty JA 77.

---

[2] The SRA's non-solicitation provision states that former employees shall not "solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client, bona fide prospective client, or marketing partner" of ADP, whereas the RCA's Non-Solicitation Provision states that former employees shall not "engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner" of ADP. Rafferty JA 42, 78.

Appellees Nicole Rafferty and Kristi Mork are both former employees of ADP who, shortly after voluntarily leaving ADP, began working at Ultimate Software Group (Ultimate), a direct competitor of ADP. Rafferty and Mork each signed the SRA and NDA at the outset of their employment in Boston and Chicago, respectively, and each were eligible for and accepted restricted stock awards pursuant to the RCA over several consecutive years.[3]

### III.  Procedural History

After ADP learned that each of Appellees joined Ultimate upon leaving, it filed a motion for preliminary injunction against each of Rafferty and Mork in the District of New Jersey, seeking enforcement of the SRA, NDA, and RCA, and alleging breach of contract, breach of duty of loyalty, and unfair competition. Their cases were consolidated only for purposes of this appeal.

### A.  District Court Proceedings in *ADP v. Rafferty* (No. 18-cv-1922)

In ADP's action against Rafferty in the District of New Jersey, which was assigned to Judge Linares, ADP sought to justify the imposition of all three restrictive covenants. Relying on the sworn statement of an ADP executive, ADP

---

[3] We use the term "RCA" going forward to refer to the 2015 RCA because, of the various iterations to which Rafferty and Mork agreed to be bound over the years, the 2015 version contains the most restrictive terms and, as the RCAs "don't supersede one another," those terms would "still be in effect." Rafferty Dkt. No. 28 at 11.

6

argued that the SRA and NDA, for their part, contain reasonable restrictions designed to protect "the client relationships and the goodwill that sales associates will develop and help develop in the course of their job duties." Rafferty JA 146. The RCAs, it urged, are similarly reasonable—albeit "more extensive"—because those employees that qualify for the stock award "demonstrate that they maintain the strongest personal relationships with their contacts at ADP and ADP's clients and prospects," "generally are involved with and have the most information about the largest number of ADP's clients and prospects," and have "demonstrated the greatest ability to attend to the specialized needs of ADP's clients quickly and with continuity." Rafferty JA 147. Thus, because the loss of high-performing employees to a competitor poses a "particularly high risk to ADP with respect to interference with customer and prospect [*sic*] relationships," ADP maintained that the "heightened restrictive covenants in the RCA provisions" are justified. Rafferty JA 148.

After a hearing, the District Court granted some of the relief requested by ADP.[4] Acknowledging *Solari Industries,*

---

[4] While Judge Linares cited his prior decision in *ADP, LLC v. Jacobs*, No. 2:15-3710 (JLL) (JAD), 2015 WL 4670805 (D.N.J. Aug. 5, 2015)—where he came to the opposite conclusion as to the enforceability of the RCAs and held that, "prospective clients aside, [ADP] ha[d] articulated all of its corporate interests in enforcing the remaining non-competition aspects of the [RCA]," *id.* at *5—he did not distinguish *Jacobs* from the instant case nor explain the reason for this divergent outcome.

7

*Inc. v. Malady*, 264 A.2d 53 (N.J. 1970), where the New Jersey Supreme Court articulated factors to determine whether a post-employment restrictive covenant is enforceable—including whether it "[1] simply protects the legitimate interests of the employer, [2] imposes no undue hardship on the employee, and [3] is not injurious to the public," *id.* at 56—the District Court concluded that the RCAs were unenforceable per se. Citing *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 762-63 (D.N.J. 1998), it reasoned that because ADP "does not require its employees to enter into the RCAs and does not even offer the RCAs to all of its employees," the "purpose behind the RCAs is not to protect [ADP]'s legitimate interests but rather to decrease competition." *ADP, LLC v. Rafferty*, No. 18-1922 (JLL), 2018 WL 1617705, at *3 (D.N.J. Apr. 2, 2018). The Court also suggested that the RCAs "may also impose an undue hardship" on Rafferty because, notwithstanding its geographic and temporal scope, the "RCAs apply broadly to *all* of [ADP]'s current or prospective clients regardless of whether [Rafferty] had contact with those clients. . . ." *Id.* at *4 (emphasis in original).

As to the enforceability of the SRA and NDA, however, the District Court reasoned that ADP *had* shown a likelihood of success because, under *Solari*, they serve a legitimate business interest in that they "are intended to protect [ADP]'s confidential and proprietary information and client relationships," and are "narrowly tailored" to that end.[5] *Id.*

---

[5] The District Court further concluded that the SRA and NDA satisfied the other elements of the preliminary injunction test: Denial of relief would cause ADP irreparable harm in the form of "loss of good will," *Rafferty*, 2018 WL 1617705, at *5; the balance of the interests tipped towards ADP because

8

Because Rafferty had conceded at a hearing that the SRA and NDA were enforceable against her, the District Court did not further elaborate as to how those agreements satisfied the *Solari* factors.

B. District Court Proceedings in *ADP v. Mork* (No. 17-cv-4613)

In ADP's action against Mork, assigned to Judge Cecchi, ADP defended the enforceability of the RCAs on the same grounds. Specifically, it put forth a declaration to support its position that those who receive restricted stock "have extensive contact with ADP clients because they sell the most ADP products and service[s] and are the most successful sales associates," Mork JA 103, and "maintain the closest personal relationships with the key contacts and personnel" of ADP's clients and prospects, *id.*, and thus "possess the greatest potential to disrupt ADP's relationships with its clients and prospective clients, [and] to harm the goodwill ADP has generated in the market," *id.*

The District Court rejected those arguments, adopting Judge Linares' reasoning in *Rafferty* in full, and concluding that "due to the RCA's problematic nature and questions concerning their ultimate legitimacy as undue restraints on trade, [ADP] has not shown a substantial likelihood of success on the merits as to its claims under the RCAs." *ADP, LLC v. Mork*, No. 17-4613 (CCC-MF), 2018 WL 3085215, at \*4 (D.N.J. June 22, 2018).

---

Rafferty would not be required to quit her job; and the issuance of the injunction was in the public interest.

## IV. Discussion

We review the District Court's denial of a preliminary injunction for abuse of discretion and any underlying legal questions de novo.[6]  *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). The four-factor preliminary injunction standard requires the moving party first to demonstrate a reasonable likelihood of success and that it would likely suffer irreparable harm absent an injunction.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).  If the moving party makes this threshold showing, the court balances these factors, along with the relative hardship that the grant or denial of an injunction would inflict on the parties and the public interest.  *Id.* at 179; *Holland v. Rosen*, 895 F.3d 272, 285-86 (3d Cir. 2018).

Applying New Jersey law, we conclude that both tiers of ADP's restrictive covenants further legitimate business interests and otherwise comply with the state's public policy. Where, as here, a district court's assessment of the merits rests on "an erroneous view of the applicable law," its denial of a preliminary injunction cannot stand.  *Am. Tel. & Tel. Co.*, 42 F.3d at 1427 (citation omitted).  Accordingly, we will vacate the District Court's order and remand for the District Court to blue pencil the agreements and reconsider the four-factor preliminary injunction standard.

---

[6] The District Court exercised diversity jurisdiction under 28 U.S.C. § 1332, and we have interlocutory jurisdiction over the District Court's denial of ADP's motion for a preliminary injunction under 28 U.S.C. § 1292(a).

A.     New Jersey Law

New Jersey has evolved from invalidating overbroad restrictive covenants outright to presumptively "compress[ing] or reduc[ing]" their scope "so as to render the covenants reasonable." *Karlin v. Weinberg*, 390 A.2d 1161, 1168 n.4 (N.J. 1978); *see Maw v. Advanced Clinical Commc'ns, Inc.*, 846 A.2d 604, 608-09 (N.J. 2004).    Known as partial enforcement or blue penciling,[7] this rule favors granting "that limited measure of relief within the terms of the noncompetitive agreement" that (1) protects a legitimate business interest, (2) does not unduly burden an employee, and (3) adheres to the public interest. *Solari*, 264 A.2d at 61.  As detailed below, by eschewing a dichotomous choice between enforcement and invalidation, New Jersey aims to fulfill a restrictive covenant's lawful objectives while nevertheless ensuring that such agreements do not unreasonably hinder competition or employee mobility.  *See Maw*, 846 A.2d at 609.

For more than a century, New Jersey has upheld restrictive covenants in employment agreements, *see Sternberg v. O'Brien*, 22 A. 348, 349-50 (N.J. Ch. 1891); *Mandeville v. Harman*, 7 A. 37, 41 (N.J. Ch. 1886), but the state initially applied an inflexible rule rendering overbroad covenants completely unenforceable, *Althen v. Vreeland,* 36 A. 479, 481 (N.J. Ch. 1897) (reasoning that a restrictive covenant "if

_____

[7] As the name suggests, the term "blue penciling" at first referred to rendering a restrictive covenant reasonable by striking divisible portions, *see Solari*, 264 A.2d at 57, but in New Jersey it has come to mean any tailoring of a restrictive covenant, *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 892 n.3 (N.J. 2005).

11

enforced at all, it must be enforced according to its terms"). The doctrine evinced a judicial reluctance to modify agreements; under this view, "distill[ing] from the broad generalities" in a restrictive covenant "narrower and more meaningful restrictions would constitute no less than a rewriting of the provision." *Hudson Foam Latex Prods., Inc. v. Aiken*, 198 A.2d 136, 141 (N.J. Super. Ct. App. Div. 1964); *see Mandeville*, 7 A. at 38. Secondary doctrines lessened the harshness of the complete-invalidation rule by allowing for the enforcement of "divisible" clauses or subsets, *see Creter v. Creter*, 145 A.2d 149, 153-54 (N.J. Super Ct. App. Div. 1958), but these exceptions "exalted formalisms and rewarded artful draftsmanships," *Solari*, 264 A.2d at 60.

In its seminal decision in *Solari Industries, Inc. v. Malady*, 264 A.2d 53 (N.J. 1970), the New Jersey Supreme Court jettisoned the complete-invalidation rule, permitting the partial enforcement of restrictive covenants where consistent with public policy. *See* 264 A.2d at 61. Under its prior approach, the New Jersey Supreme Court recognized, courts struck down restrictive covenants even when "justice and equity seemed to cry out for the issuance of appropriately limited restraints." *Id.* at 60. That is, employers may "act in full good faith" only to "find that the terms of the noncompetitive agreement are later judicially viewed as unnecessarily broad." *Id.* at 56. Under these circumstances, *Solari* recognized that tailoring overbroad restrictive covenants better accorded with the parties' written agreement than wholesale invalidation. *See id.* In other instances, the complete-invalidation rule encouraged courts to fully enforce "sweeping noncompetitive agreements" where, if given a choice, "they would have cut them down to satisfy the particular needs at hand." *Id.* at 60. Under the new approach,

12

while an employer that "extracts a deliberately unreasonable and oppressive noncompetitive covenant" should receive no benefit, courts should partially enforce an overbroad covenant as long as it is "[1] reasonably necessary to protect [an employer's] legitimate interests, [2] will cause no undue hardship on the defendant, and [3] will not impair the public interest." *Id.* at 56, 61.

Following *Solari*, New Jersey courts have strived, if possible, to salvage restrictive covenants, construing the opinion's three-part test as rarely justifying the total invalidation of a restrictive covenant. *See, e.g.*, *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789, 793, 796 (N.J. Super. Ct. App. Div. 1992) (blue penciling a restrictive covenant that had "devastating effects" on the employee and "only limited" effects on the employer to permit "substantially narrower enforcement"). As to what business interests qualify as "legitimate," *Solari*, 264 A.2d at 61, an "employer has no legitimate interest in preventing competition as such" or simply prohibiting an employee from exercising her "general knowledge" within the industry, *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971); *see Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892-93 (N.J. 1988). But New Jersey courts have stressed that employers have "patently legitimate" interests in their trade secrets, confidential business information, and customer relationships.[8] *Whitmyer Bros.*, 274

---

[8] New Jersey has accepted that an employer may adopt a restrictive covenant to protect some "highly specialized, current information not generally known in the industry" even if it does not qualify as a trade secret or confidential business information. *Ingersoll-Rand*, 542 A.2d at 894; *see Cmty. Hosp. Grp.*, 869 A.2d at 897. This interest must be

13

A.2d at 581; *Cmty. Hosp. Grp.*, 869 A.2d at 897. As long as the restrictive covenant reasonably protects one of these matters, the employer has adduced a "strong" business interest. *Ingersoll-Rand*, 542 A.2d at 892.

Most relevant here, in *A. T. Hudson & Co., Inc. v. Donovan*, 524 A.2d 412 (N.J. Super. Ct. App. Div. 1987), the Appellate Division enforced a management consulting firm's restrictive covenant to protect its former employee's client relationships. *Id.* at 416. The restrictive covenant, the court recognized, safeguarded the "significant investment of time, effort and money" the consulting firm expended "soliciting clients and developing projects for their benefit." *Id.* A restrictive covenant protects this substantial investment in a discrete set of clients, especially for employees who maintained close, continual contact with the employer's business partners. *See id.* at 413-14, 416; *Coskey's*, 602 A.2d at 795.

If a restrictive covenant reaches beyond an employer's legitimate interests, courts applying New Jersey law have typically resorted to blue penciling to fulfill the contract's lawful ends. *See Coskey's*, 602 A.2d at 796. For instance, where a restrictive covenant covers products for which no trade secrets existed, courts have blue penciled the agreement to extricate them. *See, e.g.*, *Raven v. A. Klein & Co. Inc.*, 478 A.2d 1208, 1211-12 (N.J. Super. Ct. App. Div. 1984); *see also Saccomanno v. Honeywell Int'l, Inc.*, 2010 WL 1329038, at *5 (N.J. Super. Ct. App. Div. Apr. 7, 2010) (limiting an agreement covering all "information" to just "trade secrets or confidential

---

"construe[d] narrowly," *Ingersoll-Rand*, 542 A.2d at 894, and does not pertain to the present dispute.

information"). Or, if a restrictive covenant seeks to protect client relationships, courts have narrowed the covenant to clients with which the employee interfaced. *See, e.g.*, *Saturn Wireless Consulting, LLC v. Aversa*, No. 17-1637 (KM/JBC), 2017 WL 1538157, at *12 (D.N.J. Apr. 26, 2017).

The other two *Solari* factors—undue hardship and the public interest—likewise rarely favor the complete nullification of a restrictive covenant. The second *Solari* factor's focus on *undue* hardship lends itself to blue penciling, not complete invalidation. Seldom could an employee credibly contend that, even where an employer has proffered a legitimate business purpose, *any* enforcement of a restrictive covenant would pose an undue burden. *See Ingersoll-Rand*, 542 A.2d at 892 (a court must balance the employer's interest against the hardship inflicted). And under the "public interest" factor, New Jersey has recognized only two professions for which a client's freedom to choose or the "uniquely personal" nature of the relationship militate against enforcing any restrictive covenant. *Comprehensive Psychology Sys., P.C. v. Prince*, 867 A.2d 1187, 1190 (N.J. Super. Ct. App. Div. 2005) (psychologists); *see Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d 142, 151 (N.J. 1992) (attorneys); *Cmty. Hosp. Grp.*, 869 A.2d at 895 (noting that "[e]xcept for attorneys and . . . psychologists, our courts have consistently utilized a reasonableness test to determine the enforceability of restrictive covenants" (internal citations omitted)).

Simply put, New Jersey accepts that "non-compete agreements are a common part of commercial employment," and its *Solari* framework "recognizes that noncompete agreements can serve a useful purpose so long as the agreement is not unreasonable." *Maw*, 846 A.2d at 609. To ensure that

15

such agreements remain reasonable, New Jersey courts do not hesitate to blue pencil a covenant but will rarely invalidate one in full. *See, e.g.*, *Cmty. Hosp. Grp.*, 869 A.2d at 899-900.

B.    Application to the RCA

Mindful of New Jersey's strong preference for blue penciling, we turn to whether ADP's second tier of restrictive covenants, the RCA, is wholly invalid. In evaluating the RCA, we consider (1) whether ADP has a legitimate business interest in imposing the RCA in exchange for participation in its stock-award program; (2) if so, whether that legitimate business interest is negated because the RCA, which is imposed on a subset of ADP employees, is layered on top of the SRA and NDA, which are imposed on all employees; (3) whether the breadth of the RCA imposes a level of hardship on employees so great as to render it entirely unenforceable; and (4) whether, on balance, the RCA is injurious to the public.

1.    *The RCA Serves a Legitimate Business Interest*

The enforceability of the RCA, a supplemental layer of restrictive covenants that are imposed on only those ADP employees who qualify for and accept ADP's stock-option award, depends on whether it "simply protects the legitimate interests of [ADP]." *Solari*, 264 A.2d at 56. Appellees concede that ADP has a legitimate interest in protecting its client relationships by imposing the more modest restrictions set forth in the SRA and NDA on all employees, but argue that it has no legitimate interest in imposing the "more onerous RCAs" on a small group of high-performing employees

16

because "ADP's legitimate interests were fully protected by the SRA and NDA." Rafferty's Br. 19. We disagree.

The preservation of client relationships and the goodwill they generate are among the business interests that New Jersey courts consistently recognize as legitimate and worthy of protection. *See Whitmyer*, 274 A.2d at 581; *A. T. Hudson & Co.*, 524 A.2d at 415. As a client services business, ADP's viability depends on its ability to attract—and retain—its clients. And by setting sales goals for its employees and identifying the subset of employees that meet or exceed those goals, ADP has the ability to empirically measure which of its employees have more extensive client contact. Employees can achieve this more extensive client contact in one of two ways—by virtue of selling to a greater number of customers or by selling more products to a smaller number of customers. Either way, post-termination competition from those employees or their solicitation of ADP's clients and Business Partners would pose a greater threat to ADP's business than would that of employees who failed to meet their sales goals and thus, necessarily, have less contact with ADP's clients. ADP therefore has a legitimate business interest in imposing the RCA on this subset of employees, and the RCA's heightened restrictive covenants, over and above those in the SRA and NDA, are reflective of the greater damage those employees could inflict on ADP upon their departure.

2. *Selective Imposition of the RCA Does Not Negate ADP's Legitimate Business Interests*

Appellees additionally argue, and the District Courts agreed, that any legitimate interest in protecting client

17

relationships that the RCA may serve is negated by virtue of the fact that it is selectively imposed on a subset of ADP employees as a second layer of restrictive covenants, and is not conditional of anything other than receipt of the stock award itself. They argue that because the acceptance of the RCA was not a condition of initial or continued employment, it did not entitle the employees to access any "additional" or "different" confidential information, such as client lists, Rafferty Br. 19-20, and was not tied to any specific employment milestones, the imposition of the RCA bespeaks an intent to "prevent[] competition as such," *Whitmyer*, 274 A.2d at 581, rendering any proffered legitimate business interest mere pretext.

Appellees' argument largely relies on the reasoning set forth in *Laidlaw*, which held that a restrictive covenant tied to a stock-option award was an unenforceable restraint of trade under New Jersey law because its "primary purpose" was "to buy out potential competition." 20 F. Supp. 2d at 763. Framing the issue in colloquial terms, the district court noted that businesses typically require prospective employees to sign restrictive covenants that say, in effect:

> We want to hire you. But if you come work for us, you will obtain confidential information and develop customer relationships while working here. After you leave us, we do not want you to go out and use that information and those relationships to harm us. So if you want to work for us, you have to first promise that you will not compete against us for a period after you leave us.

18

*Id.* at 763. Because the restrictive covenant was not a condition of "employment, obtaining a particular position within the Company, receiving confidential information, or the opportunity to develop customer relationships," and instead the employees bound by it had begun receiving proprietary information and developing client relationships before agreeing to its terms, the district court concluded that they served no legitimate business interest and were per se unenforceable. *Id.* at 763-65.

We, like most courts that have confronted this issue,[9] are not persuaded by *Laidlaw* and decline to adopt its

---

[9] While the District Judges here and Judge Kessler of the New Jersey Superior Court found *Laidlaw* persuasive in this context, *see ADP, LLC v. Hobaica*, No. C-118-16 (Oral Op. N.J. Super. Ct. Law Div. Apr. 23, 2018) (Rafferty Addendum 72-75); *ADP, LLC v. Kusins*, No. ESX-C-264-15 (Ltr. Op. N.J. Super. Ct. Ch. Div. June 27, 2017) (Rafferty JA 585-659); *ADP, LLC v. DeMarco*, No. C-120-16 (Ltr. Op. N.J. Super. Ct. Ch. Div. Apr. 27, 2017) (Rafferty Addendum 1-69), most judges have not, *see ADP, LLC v. LeNoble*, No. ESX-C-117-16 (Ltr. Op. N.J. Super. Ct. Ch. Div. Jan. 24, 2018) (Rafferty JA 897-936); *ADP, LLC v. Manchir*, No. M2016-02541, 2017 WL 5185458 (Tenn. Ct. App. Nov. 8, 2017); *ADP, LLC v. Hopper*, No. ESX-C-23-16, (Oral Op. N.J. Super. Ct. Ch. Div. June 30, 2017) (Rafferty JA 770-830); *ADP, LLC v. Karamitas*, No. ESX-C-143-16 (Oral Op. N.J. Super. Ct. Ch. Div. June 30, 2017) (Rafferty JA 850-895); *ADP, LLC v. Lynch*, Nos. 2:16-1053 (WJM), 2:16-01111 (WJM), 2016 WL 3574328 (D.N.J. June 30, 2016), *aff'd* 678 F. App'x 77, 80 (3d Cir. 2017); *ADP, LLC v. Jacobs*, No. 2:15-3710 (JLL) (JAD), 2015 WL 4670805 (D.N.J. Aug. 5, 2015).

reasoning.[10] And while the New Jersey Supreme Court has acknowledged that it may be "difficult to draw" the line

---

[10] Relatedly, Appellees' argument that ADP should be collaterally estopped from arguing that the RCAs are enforceable because a number of trial court decisions have held the RCAs unenforceable is meritless. Whether a state court judgment should have a preclusive effect in a subsequent federal action depends on the law of the state that adjudicated the original action; here, the law of New Jersey. *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir. 1999). "New Jersey courts follow the doctrine of collateral estoppel or the rule of issue preclusion described in the Restatement of Judgments." *Hernandez v. Region Nine Hous. Corp.*, 684 A.2d 1385, 1391 (N.J. 1996). The Restatement states, in pertinent part, that in order to avoid a preclusion bar, a plaintiff must demonstrate that it "lacked full and fair opportunity to litigate the issue" in the prior proceeding, or that "other circumstances justify affording [plaintiff] an opportunity to relitigate the issue." Restatement (Second) of Judgments § 29 (1982). Among the factors to be considered as to this limitation of collateral estoppel in a subsequent litigation is whether "[t]he determination relied on as preclusive was itself inconsistent with another determination of the same issue," *id.*, in which case a court's "confidence [in the result] is generally unwarranted," *id.* § 29 cmt. f. Here, there are clearly inconsistent prior determinations, such that this Court cannot be confident in (in fact, it rejects) the result Judge Kessler reached in cases finding these restrictions unenforceable. Accordingly, ADP is not precluded from arguing that the RCA is enforceable, notwithstanding any prior judgments to the contrary.

between a corporation's legitimate attempts to protect its client relationships and illegitimate attempts to lay claim to the "general skills and knowledge of a highly sophisticated employee," *Ingersoll-Rand*, 542 A.2d at 894, we do not perceive a bright line rule that restrictive covenants are unenforceable restraints on trade if imposed selectively and as a second layer—the rule apparently endorsed by the *Laidlaw* court and the District Courts here—to be consistent with *Solari* and its progeny.

For one, ADP's two-tiered system of binding only a subset of high-performing employees necessarily amounts to *less* of a restraint on trade than a single-tier system in which ADP imposed the RCA on all employees at the outset of employment. While New Jersey courts certainly recognize that "[e]ach client that [ADP] is able to attract represents a significant investment of time, effort and money which is worthy of protection," ADP is not in a position to know at the time of hire from which of its employees it will most need that protection. *A. T. Hudson & Co.*, 524 A.2d at 416. Thus, ADP restrains trade less by declining to uniformly, and perhaps prophylactically, impose the RCA until it knows, through the proxy of met sales targets, which of its employees will go on to develop either a greater number of or deeper relationships with ADP's clients (or both). Appellees object that "ADP did not and cannot offer any evidence that high performers bound to the more restrictive RCAs have access to additional confidential information that is not available to lower performers who are only bound by the SRA and NDA." Rafferty Br. 20. But as even Appellees seem to recognize, that observation bears only on ADP's ability "to meet its burden to show that the RCAs were aimed at protecting ADP's *confidential information*," *id.* (emphasis added); it does not

21

detract from the ample evidence in the record that the RCA is aimed at protecting ADP's client relationships.

Nor are we persuaded that because "[p]articipation in ADP's incentive stock awards was entirely voluntary," Mork Br. 26, and because ADP does not penalize its qualifying employees for declining to accept the award and accompanying RCA, "the primary purpose of the stock-option non-competes is not to protect [ADP's] legitimate interests, but to buy out potential competition," *Laidlaw*, 20 F. Supp. 2d at 763. For starters, we find the premise of this argument itself questionable, for ADP employees who decline to agree to the RCA are penalized in that they must forego the compensation award that they otherwise have earned. But more fundamentally, ADP's decision not to further penalize employees for rejecting the RCA is not proof that the RCA is "principally directed at lessening competition." *Ingersoll-Rand*, 542 A.2d at 889 (citation omitted). Rather, as reflected in the declarations of ADP's witnesses, it manifests a reasonable business judgment as to how to best balance its employees' and the public's need for free competition with its own need to protect its legitimate business interests.[11]

_____

[11] We are not unmindful of the language appearing in one of the declarations submitted by ADP in support of its motions for preliminary injunction that identifies as one justification for the RCA the notion that employees subject to it have demonstrated "unique knowledge, skills and job performance," Rafferty JA 148—precisely the kinds of intangible tools that New Jersey courts say employers have "no legitimate interest" in protecting, *Whitmyer Bros*., 274 A.2d at 581. That isolated statement, however, does not undermine ADP's other evidence reflecting that the RCA principally

In concluding that ADP's interests are strong enough to warrant enforcement of its RCA, we do not disregard the fact that Appellees may have countervailing interests, including that they have acquired skill and expertise while working at ADP that have "become part of the[ir] person," and that now "belong to [them] as [individuals] for the transaction of any business in which [they] may engage." *Id.* at 892 (citation omitted). As the New Jersey Supreme Court instructs, however, under these circumstances courts should tailor the restrictions through the process of blue penciling rather than holding them to be void per se where, as here, there is no allegation or evidence of bad faith. *See Solari*, 264 A.2d at 61. We turn next to that analysis.

### 3. *Undue Hardship*

Under New Jersey law, "[e]ven if the covenant is found enforceable" because it serves legitimate business interests, "it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity" so that those interests are not outweighed by the hardship the covenant inflicts on the employee. *Coskey's*, 602 A.2d at 793 (citations omitted). To determine whether and to what extent the RCA must be blue penciled, the Court must "balance the

---

serves a legitimate business purpose. Even in the declaration in which this troubling language appears, the declarant goes on to explain that the RCA is imposed on those employees who, by virtue of their client relationships developed over time, have "the greatest potential to disrupt ADP's relationships with its clients and prospective clients, [and] to harm the goodwill ADP has generated in the market." Rafferty JA 148.

23

employer's need for protection and the hardship on the employee that may result." *Ingersoll-Rand*, 542 A.2d at 894.

We acknowledge that the enforcement of the RCA would impose some level of hardship on former ADP employees who want to market themselves in the same field in which they have previously worked. After all, it would require them to refrain from soliciting business from anyone "with whom ADP reasonably expects business within the two (2) year period following [their] . . . termination of employment," and to refrain from working "in any manner with a Competing Business anywhere in the Territory where doing so will require [them]" to either "provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed," or "use or disclose ADP's Confidential Information or trade secrets." Rafferty JA 78. "The question remains, however, whether this hardship [is] 'undue,' when balanced against the legitimate interest of the employer." *Coskey's*, 602 A.2d at 794.

Many courts considering the enforceability of the RCA, including Judge Linares in a decision three years before the case presently before us, have concluded, at the very least, that "restricting [former ADP employees] from soliciting prospective clients—of which [they] did not gain knowledge of [*sic*] through ADP"—is not a reasonable covenant provision. *ADP, LLC v. Jacobs*, No. 2:15-3710 (JLL) (JAD), 2015 WL 4670805, at *5 (D.N.J. Aug. 5, 2015); *see also ADP, LLC v. Lynch*, Nos. 2:16-1053 (WJM), 2:16-01111 (WJM), 2016 WL 3574328, at *7-*9 (D.N.J. June 30, 2016), *aff'd* 678 F. App'x 77, 80 (3d Cir. 2017); *ADP, LLC v. Manchir*, No. M2016-02541-COA-R3-CV, 2017 WL 5185458, at *6-*9 (Tenn. Ct. App. Nov. 8, 2017). Others have deemed heavier

24

blue penciling necessary to render the RCA not unduly burdensome, by, *inter alia*, limiting the restricted "Territory" in the non-compete in terms of both geographic area and market share, *see ADP, LLC v. LeNoble*, No. ESX-C-117-16 (Ltr. Op. N.J. Super. Ct. Ch. Div. Jan. 24, 2018) (Rafferty JA 930) ("The Court finds that the non-competition clauses in this matter should be limited to both the northwest Chicago suburbs and to employers with fewer than fifty employees."), or by "blue pencil[ing] the geographic restriction [contained in the non-compete clause] into the non-solicitation clause," *ADP, LLC v. Hopper*, No. ESX-C-23-16, (Oral Op. N.J. Super. Ct. Ch. Div. June 30, 2017) (Rafferty JA 809).

Here, ADP concedes—perhaps in light of these decisions—that the non-solicitation provision of the RCA is overbroad and must be blue penciled to the extent that it restricts employees from soliciting prospective clients "of which [Appellees] did not gain knowledge of [*sic*] through ADP." ADP Rafferty Br. 19 (quoting *Jacobs*, 2015 WL 4670805, at *5). The District Courts, however, having concluded that the RCA was unenforceable per se, did not have occasion to consider the effect of this concession or the extent to which the RCA could be blue penciled to avoid an undue burden on Appellees.

They also did not have an opportunity to consider other facts relevant to the extent of the hardship Appellees will suffer if the RCA is enforced, including whether it would preclude the employee from being able to earn a living in his or her occupation,[12] *see Karlin*, 390 A.2d at 1169, and the fact that

---

[12] On this point, ADP contends that contrary to Judge Linares' conclusion that ADP "seeks to enjoin [Rafferty] from

25

both Appellees voluntarily resigned from ADP and chose to immediately join Ultimate, a direct competitor, thereby arguably "br[inging] any hardship upon [themselves]," *Cmty. Hosp. Grp.*, 869 A.2d at 898.

In short, the undue hardship factor, too, counsels in favor of blue penciling and, in any event, compels a remand for the District Court to determine in the first instance the extent of the employees' hardship and the specific revisions that could be made to render the RCA reasonable under the circumstances.

4.    *Injury to the Public*

The final *Solari* factor instructs courts to consider the fact that "enforcement of the restriction should not cause harm to the public." *Id.* (citing *Karlin*, 390 A.2d at 1161). Because this case contains "no major public component," the imposition of restrictive covenants here creates no injury to the public in the nature of "the rights of the public to have free access to the advice of professionals licensed by the State," *Coskey's*, 602 A.2d at 793, as it may, for example, in the context of physicians

_____

working for Ultimate for a period of twelve months," *Rafferty*, 2018 WL 1617705, at *3, it is merely asking "that she be precluded from working within her prior ADP territory for one year, consistent with the terms of the RCAs," ADP Rafferty Br. 25. "Since her territory at [Ultimate] is larger than her territory was at ADP, there is no reason for her to be required to quit her job. *Id.* While the District Courts found these points salient with respect to the *Solari* analysis of the SRA and NDA, they did not reach them with respect to the RCA, having concluded that they are unenforceable per se.

26

and accountants, *see Karlin*, 390 A.2d at 1169-70 (physicians); *Schuhalter v. Salerno*, 653 A.2d 596, 600 (N.J. Super. Ct. App. Div. 1995) (accountants). Here, the public interest points both ways—towards the employees' ability to use their marketable skills and the employer's interest in protecting its goodwill and client relationships—and is ultimately equivocal. Thus, we are confident that the approach outlined above balances the relative interests of ADP and Appellees in a way that comports with the public interest, including the clear preference under New Jersey law to modify overbroad restrictive covenants rather than nullify them outright.

* * *

Having concluded that the RCA is not a per se unenforceable restraint on trade and that each of the *Solari* factors favors at least partial enforcement, we will leave the next steps concerning appropriate balancing and blue penciling in the capable hands of the District Courts.

## V. Conclusion

For the foregoing reasons, we will vacate the judgment of the District Courts and will remand for further proceedings consistent with this opinion.