NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-4664-16T1
A-0692-17T3
A-0693-17T3
A-2990-17T4
A-4407-17T4
A-4527-17T4

ADP, LLC,

     Plaintiff-Appellant/
Cross-Respondent,

v.

ERIK KUSINS,

     Defendant-Respondent/
Cross-Appellant.

_____

ADP, LLC,

     Plaintiff-Appellant,

v.

RYAN HOPPER,

     Defendant-Respondent.

_____

ADP, LLC,

     Plaintiff-Appellant,

<table>
<tr><td><strong>APPROVED FOR PUBLICATION</strong></td></tr>
<tr><td><strong>July 26, 2019</strong></td></tr>
<tr><td><strong>APPELLATE DIVISION</strong></td></tr>
</table>

v.

ANTHONY M. KARAMITAS,

    Defendant-Respondent.

_____

ADP, LLC,

    Plaintiff-Appellant,

v.

NICK LENOBLE,

    Defendant-Respondent.

_____

ADP, LLC,

    Plaintiff-Appellant,

v.

MICHAEL DEMARCO,

    Defendant-Respondent.

_____

ADP, LLC,

    Plaintiff-Appellant,

v.

DANIEL HOBAICA,

    Defendant-Respondent.

_____

2

Argued May 15, 2019 – Decided July 26, 2019

Before Judges Koblitz, Currier, and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket Nos. C-000264-15, C-000023-16, C-000143-16, C-000117-16, C-000120-16, and C-000118-16.

Timothy J. Lowe (McDonald Hopkins, PLC) of the Michigan bar, admitted pro hac vice, argued the cause for appellant/cross-respondent in A-4664-16 and appellants (Genova Burns, LLC, James Boutrous (McDonald Hopkins, PLC) of the Michigan bar, admitted pro hac vice, and Timothy J. Lowe, attorneys; Harris S. Freier, James Boutrous, and Timothy J. Lowe, on the briefs in A-4664-16, A-0692-17, A-2990-17, and A-4407-17; Harris S. Freier and Timothy J. Lowe, on the briefs in A-0693-17; Harris S. Freier, on the briefs in A-4527-17).

John H. Schmidt, Jr., argued the cause for respondent/cross-appellant in A-4664-16 and respondents (Lindabury, McCormick, Estabrook & Cooper, PC, attorneys; John H. Schmidt, Jr., and Stacey K. Boretz, on the briefs).

The opinion of the court was delivered by

CURRIER, J.A.D.

In these consolidated appeals, we consider the enforceability of the restrictive covenant agreements (RCAs) executed by the six defendants during their employment with plaintiff ADP, LLC. Each defendant was a top-performing sales representative. To award and incentivize their success, ADP invited defendants to participate in a stock award incentive program

3

conditioned on their acceptance and execution of an RCA. Each defendant assented to the RCA and accepted the stock awards for several years.

The RCA included non-solicitation and non-compete provisions that restricted an employee from soliciting ADP's clients and competing with ADP upon leaving the company. The defendants left ADP at varying times and each accepted employment with the same direct competitor. Consequently, litigation ensued in which ADP sought to enforce its RCAs.

The courts'[1] treatment of the various lawsuits has been inconsistent. We strive to bring some clarity and uniformity to the consideration of an RCA, and to provide the parties guidance for the drafting of such covenants.

In our review of the RCAs at issue here, we are satisfied that because ADP presented evidence of a legitimate business interest to support the imposition of the covenant's restrictions, the covenant is not entirely unenforceable. However, its non-solicitation and non-compete provisions are overly broad and require blue-penciling[2] to ensure they reasonably guard

---

[1] ADP has pursued litigation in both the New Jersey state courts and several federal courts.

[2] The term "blue pencil[ing]" refers to a court's modification or tailoring of a restrictive covenant. See Cmty. Hosp. Grp., Inc. v. More, 183 N.J. 36, 50 n.3 (2005).

ADP's interest in protecting its customer relationships without imposing an undue hardship on its former employees.

For the reasons that follow, ADP may only prohibit its employees, upon separation from the company, from soliciting any of ADP's <u>actual</u> clients with whom the former employee was directly involved or who the employee knows to be ADP's client. As to the solicitation of <u>prospective</u> clients, it is unreasonable and onerous to restrict defendants from soliciting clients unknown to defendants while at ADP. Therefore, when working for a competitor, a former employee is only prohibited from soliciting a prospective ADP client if the employee gained knowledge of the potential client while at ADP and directly or indirectly, solicits that client after leaving.

In considering the non-compete provision, we find it reasonable for ADP to restrict its former employees, for a reasonable time, from providing services to a competing business in the same geographical territory in which the employee operated while at ADP.

We, therefore, reverse the trial court orders that found the RCAs to be unenforceable.[3] We also reverse the trial court orders that fell short of

---

[3] <u>ADP, LLC v. Hobaica</u>, No. C-0118-16 (Law Div. 2018); <u>ADP, LLC v. DeMarco</u>, No. C-0120-16 (Law Div. 2018); <u>ADP, LLC v. Kusins</u>, No. C-0264-15 (Law Div. 2017).

declaring the RCAs unenforceable, but placed greater restrictions on the non-solicitation and non-compete provisions than the standards set here.[4]  Because each defendant breached the RCAs to some extent, we remand the matters to the trial court to determine the appropriate remedy for the breach and to consider ADP's application for counsel fees.[5]

I.

ADP, a human capital management firm, provides a range of business outsourcing and software services pertaining to human resources, payroll, taxes, and benefits administration to over 620,000 companies worldwide.  It contends that to protect its confidential business interests, it uses a two-tiered system of restrictive covenants.

When an employee is initially hired by ADP, he or she is required to sign either a sales representative agreement (SRA), a non-disclosure agreement (NDA), or both.  Those agreements contain general non-compete and non-solicitation provisions that are narrowly tailored in scope and geographical

---

[4]  ADP, LLC v. LeNoble, No. C-0117-16 (Law Div. 2018); ADP, LLC v. Karamitas, No. C-0143-16 (Law Div. 2017); ADP, LLC v. Hopper, No. C-0023-16 (Law Div. 2017).

[5]  For consistency, the remanded cases should be assigned to the same judge.

6

region, and prevent employees from soliciting any clients the employee had contact with at ADP for twelve months after terminating their employment.[6]

For its top employees who meet or exceed their sales targets, ADP offers an annual stock option incentive. The incentive is conditioned upon the acceptance of a secondary RCA. The RCAs tied to the stock incentives are "click-wrap" agreements, which require the employee to check a box on a computer screen to indicate he or she reviewed the RCA and agreed to its terms, before accepting the stock incentive.[7]

Prior to 2013, the RCAs for the stock options were narrowly tailored and largely tracked the initial SRAs and NDAs that employees signed upon their hire. The pre-2013 RCAs only precluded an employee from soliciting ADP's clients with whom he or she had contact, and limited the non-compete provisions to the geographical territory the employee worked in while at ADP.

---

[6] The initial NDA in <u>Hopper</u> did not contain any non-solicitation or non-compete provisions.

[7] A clickwrap agreement requires a computer user to affirmatively manifest assent to the terms of a contract. <u>See</u> <u>Specht v. Netscape Commc'ns Corp.</u>, 306 F.3d 17, 22 n.4 (2d Cir. 2002) (explaining clickwrap "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the . . . agreement by clicking on an icon") (quoting <u>Specht v. Netscape Commc'ns Corp.</u>, 150 F. Supp. 2d 585, 593-94 (S.D.N.Y. 2001)). If defendants did not affirmatively manifest assent to the terms by taking the required action, they could not proceed and obtain the offered stock award. Defendants have not disputed the validity of the clickwrap agreements.

The post-2013 RCAs, however, were more restrictive and prevented employees from soliciting <u>any</u> actual or prospective ADP client, regardless of the employee's geographical location or personal contact with the client, for a twelve-month period after termination. Any violation of the RCA tolled the time period that the covenants remained in effect. In addition, the later RCAs permitted ADP to recoup all reasonable attorney's fees and costs incurred in their enforcement.

Participation in the stock award program was voluntary; ADP's top employees who chose not to participate in the program were not required to accept the RCAs. The 2014 RCA is the crux of this dispute.

Against that backdrop, we turn to a discussion of each defendant, his employment history, and the trial court proceedings.

A.

In May 2007, defendant Erik Kusins was hired by ADP and signed a SRA, which contained non-compete and non-solicitation provisions. Those provisions prohibited Kusins from soliciting ADP's clients that he had contact with at ADP, and prevented him from working in a similar role for a competitor in "any territory" that he managed or was assigned to while at ADP.

Kusins was initially hired as a client district manager. In that role, he managed ADP's accounts for clients with 100 to 1000 employees in "towns and

areas throughout Eastern Massachusetts" for approximately five and a half years. Thereafter, Kusins accepted a position in ADP's business process outsourcing department, where he worked for approximately one year. During that time, he was responsible for attracting prospective clients with 150 to 1000 employees in Eastern Massachusetts.

In 2013, Kusins was promoted to sales executive, where he managed employees responsible for attracting new clients for ADP in the Eastern Massachusetts region. Kusins was promoted again in 2015 and assigned to ADP's national accounts division, where he sold ADP products and services to employers with between 1000 and 5000 employees in Massachusetts, New Hampshire, and Maine. He had a list of seventy-five clients and prospects, and access to pricing information.

During his employment with ADP, Kusins met or exceeded his yearly sales targets six times between 2008 and 2014. In those six years, he accepted the incentive stock options and the required RCAs by clicking an online agreement. The RCAs executed from 2008 through 2012 were similar to the SRA, and narrowly tailored in scope and geographic territory. As stated, the RCAs in 2013 and 2014 were much broader.

The disputed 2014 RCA, assented to by each defendant, states, in relevant part:

A-4664-16T1

3.  Non-Competition.  I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed. . . .

4.  Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.

       a.  Clients:  I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of ADP, for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information.  I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

A-4664-16T1

. . . .

5. Non-Solicitation of Employees. I agree that during my employment with ADP and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, hire, solicit, recruit, or encourage to leave ADP, any current employees of ADP or hire, solicit, recruit, or contact with employees who terminate their employment with ADP within twelve (12) months following my termination date.

6. Non-Disclosure and Non-Use of Confidential Information and Trade Secrets. During my employment . . . and after the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information. . . .

. . . .

11. Relief, Remedies, and Enforcement. I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP['s] goodwill and client relations, Confidential Information and trade secrets . . . . I agree that if ADP substantially prevails in any litigation arising out of or relating to this Agreement . . . ADP shall be entitled to recovery of its reasonable attorneys' fees and associated costs. . . .

12. Tolling. The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This

tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

The agreement also defined certain key terms used above as follows:

c. "Clients" means any individual, corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, or government entity for whom ADP provided or provides products or services in connection with the Business of ADP or whom ADP has actively solicited in connection with the Business of ADP.

d. "Competing Business" means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked – for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

e. "Confidential Information" means information . . . that is created, compiled, or gathered by ADP or its agents and is related to the Business of ADP. . . . Confidential Information includes but is not limited to information about: ADP's operations, products, and services; research and development of ADP products and services; . . . names and other listings of current or prospective Clients, Business Partners, and Vendors (including contact information that may be compiled in computer databases that are not owned or controlled by ADP . . . ;

proposals made to current or prospective Clients, Business Partners, and Vendors or other information contained in offers or proposals to such Clients, Business Partners, and Vendors; the terms of any arrangements or agreements with Clients, Business Partners and Vendors, including the amounts paid for such services or how pricing was developed by ADP, the implementation of Client-specific projects, the identity of Business Partners and Vendors, and Business Partner and Vendor pricing information, the composition or description of future services that are or may be provided by ADP; ADP's financial, marketing, and sales information; and technical expertise and know-how developed by ADP, including the unique manner in which ADP conducts its business. . . .

.  .  .  .

g. "Material Business Contact" means contact that is intended to establish or strengthen a business relationship for ADP.

h. "Territory" means the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP.

Lastly, the RCA explicitly stated that it supplemented all existing agreements, "include[ing] the same or similar covenants," so those covenants would "provide ADP with the greatest protection enforceable under applicable law."

In September 2015, Kusins resigned from ADP. He met with his direct supervisor, Anne Marie McMurray, to discuss the clients he had been working with and, later, sent a series of emails to McMurray, detailing the clients with which he was involved. Kusins also turned over all notes and documents

13

containing ADP's confidential information, and his company-issued laptop and iPad. Two days later, ADP sent Kusins a letter reminding him of his obligations under the RCAs.

Less than two weeks after his resignation, Kusins began working as a sales representative for Ultimate Software Group (USG). At USG, Kusins sold human resources software to companies with over 2500 employees in Massachusetts, New Hampshire, Maine, Connecticut, New York, New Jersey, and Pennsylvania. He had worked in three of those same territories while at ADP.

ADP alleged that Kusins violated the terms of the SRA and RCAs by soliciting ADP's clients in his new employment. Its complaint asserted claims for breach of contract, breach of the duty of loyalty, misappropriation of trade secrets, and unfair competition. Kusins's answer and counterclaims contended that the 2013 and 2014 RCAs were overly broad and unenforceable.[8]

Following the completion of discovery, ADP and Kusins filed competing motions for summary judgment. Finding contested issues of fact, the trial judge ordered a plenary hearing. During the hearing, McMurray and Kusins testified about the RCAs at issue and the nature of Kusins's employment with ADP.

---

[8] The suits instituted by ADP against each defendant contain similar allegations and causes of action. The defenses and counterclaims are also substantially similar.

A-4664-16T1

McMurray testified that she led the global enterprise solution division in the New England region for national accounts at ADP. In that role, she managed a team of associates, including Kusins.

In discussing the incentive program, McMurray explained that the employees who were invited to receive incentive stock options were "top performing associates," who had "the greatest understanding about [ADP's] products, about how [ADP is] unique in the market," about what made ADP "more competitive," and who had "strong relationships with [ADP's] clients." McMurray stated that a strong relationship with a client led to greater sales. She believed the second-tier RCAs were broader because the employees receiving the incentive stock options cultivated "insight[,] . . . information, and relationships" that could be "very damaging from a brand perspective and a loss of accounts, and referrals."

ADP alleged that Kusins breached the SRA and RCAs by: (1) asking a coworker at USG to solicit business from an ADP client that Kusins had worked with at ADP; (2) advising his sales representatives at USG to "attack" ADP's clients; (3) preparing a business plan at USG, which listed four of ADP's prospective clients that he had been in contact with while at ADP; (4) soliciting business from several clients he dealt with at ADP; and (6) disclosing ADP's confidential information to salespeople at USG.

15

McMurray further attested to the harm Kusins had caused ADP, specifically with regard to his solicitation of a particular ADP client. She explained that ADP was engaged in contract renewal with the client and had to use "a significant amount of resources" to keep the business. Kusins's conduct in soliciting ADP's client had damaged ADP's relationship with the client, diminished ADP's reputation, and made it more difficult to "sell new products and services" to its former client. ADP had also lost revenue from its reduced business with the client.

After hearing testimony, and considering the proofs submitted on the summary judgment record, the trial judge[9] concluded in a written opinion that Kusins had breached the terms of the initial SRA by soliciting both prospective and actual clients of ADP after leaving to work for USG.

Therefore, the judge equitably tolled the restrictive covenants in the SRA and, for a period of twelve months from the date of the order, enjoined Kusins from soliciting any actual or prospective ADP client that he worked with while employed at ADP and from soliciting or recruiting any ADP employee. The judge also prohibited Kusins from ever using or disclosing ADP's confidential, proprietary or trade secret business information.

---

[9] Two different trial judges handled these six cases. One judge considered and ruled in Kusins, DeMarco, and Hobaica. A second judge issued decisions in Hopper, Karamitas, and LeNoble.

In considering the RCAs, however, the judge came to a different conclusion. He determined the RCAs to be overbroad, "anti-competitive and unenforceable," as they were "designed to stifle competition rather than protect [ADP's] legitimate business interest." The judge found that ADP offered "no legitimate business reason for imposing these covenants only on their best sales people."

In its June 29, 2017 order, the judge also denied ADP's claims for monetary damages, counsel fees, and contractual tolling, because those provisions were only contained in the unenforceable RCAs.

B.

Upon commencing employment with ADP in 2009, defendant Ryan Hopper signed an NDA. The NDA contained general provisions prohibiting Hopper from using or disclosing ADP's confidential information, trade secrets, or proprietary information, except as required to fulfil his duties as an employee. The NDA did not contain any non-compete or non-solicitation provisions.

Hopper initially worked in the small business sales division at ADP. In that role, he sold payroll products and services to employers with one to forty-nine employees in the Minneapolis, Minnesota area. After approximately two years in that position, Hopper was promoted to associate district manager, and assigned to the downtown Minneapolis and North Minneapolis sales territory. In that position, Hooper had his "own client list and [his] own prospect list." Over

the next six years, Hopper received several promotions, culminating in his role as a sales executive in the Minneapolis and St. Paul territories.

Hopper met his sales targets and accepted ADP's stock award incentives from 2012 to 2014, requiring him to execute the "click-wrap" RCAs in each of those years. Although the 2012 RCA was similar to the NDA Hopper signed upon his hiring, it also included provisions that prevented him, for a period of twelve months after termination, from soliciting any of ADP's clients he had worked with at the company or hiring or soliciting ADP's employees. The more expansive 2013 and 2014 RCAs prevented Hopper from soliciting any of ADP's clients, regardless of his prior interaction with the client, and contained tolling and attorney's fees provisions.

After Hopper resigned from ADP in 2015, he began employment at USG, where he sold human resources software to employers with 200 to 500 employees in the sales territory of North Dakota, South Dakota, Iowa, Nebraska, Wyoming, Montana, and Idaho. He did not sell any USG products in the territories where he had worked while at ADP.

Following discovery, the parties filed competing summary judgment motions. ADP argued that Hopper violated the terms of the NDA and RCAs by soliciting four of ADP's clients and an ADP employee. ADP contended the RCA was enforceable because it served to protect its legitimate business interests.

The deposition testimony of Sean Burns, an ADP division vice-president, supported ADP's motion.[10]  Burns discussed ADP's "price book," an internal electronic system that contains ADP's "[p]ricing services" and other confidential information.  He explained that ADP's salespeople in small business sales would use the price book to generate quotes and proposals for prospective clients.  The salespeople were instructed to inform their "potential prospects" that the pricing information was "confidential and proprietary" and should not be shared with third parties.  When discussing information that Hopper possessed about markets for potential employers with over fifty employees, Burns stated:

> Ryan worked hand in hand with [ADP's] major accounts and [ADP's] market team, and as I said earlier, he was my best associate and my best team in partnering with them.  So I think it's fair to make an assumption that he had a pretty good knowledge of the market because he passed [major accounts more than a hundred] referrals.

Burns asserted Hopper breached the non-solicitation and non-compete provisions by "talking to ADP clients. . . . [in] his new territory," and potentially "soliciting business from ADP clients."

Burns further testified that the confidential information ADP sought to protect included the information obtained by its employees during ADP's

---

[10]  Hopper had "directly" and "indirectly" reported to Burns for five years while at ADP.

training and leadership development programs. He stated that the information imparted to Hopper would be useful if working for a direct competitor. Burns explained:

> [ADP] develop[s] young, immature salespeople who don't have any experience in the business or experience selling or experience even working for a large organization. And . . . business maturity, sales development, go-to-market strategies, selling skills, leadership programs, . . . are all things that attract people to [ADP] and they take with them when they leave, whether it's in paper copy or not.

On June 30, 2017, the trial judge delivered an oral opinion granting each party's motion for summary judgment in part. The judge found the RCA was an enforceable "click-wrap" agreement that Hopper assented to online, but rejected Hopper's argument that the RCA was "void ab initio" based on ADP's breach of the covenant of good faith and fair dealing. Summary judgment was entered in favor of ADP on those two issues.

However, with regard to the enforceability of the non-solicitation provisions in the RCAs, the judge found: (1) the prohibition on soliciting prospective clients was overly broad; (2) the prohibition on soliciting ADP clients in general was overly broad; and (3) both non-solicitation provisions were unenforceable as written. Therefore, the judge blue-penciled a geographic restriction into the non-solicitation provisions of the RCAs, limiting their applicability to actual clients in Hopper's geographic territory

that he had worked in while at ADP, and for prospective clients, the territory he was "familiar with" while at ADP.

The judge then turned to Hopper's alleged breaches of the non-solicitation clause as blue-penciled. Because Hopper had solicited clients located outside of the territory he worked in while at ADP, the judge found he had not breached the terms of the blue-penciled RCAs. Although the judge found Hopper had breached the terms of the RCA in soliciting an ADP employee, he described it as a "minimal violation." He denied ADP's claims regarding: (1) inevitable disclosure of ADP's protected information; (2) breach of the duty of loyalty; and (3) unfair competition, finding insufficient proofs to sustain the claims.

The judge also denied ADP's request to toll the one-year period contained in the RCAs, finding that "[ADP] received the benefit of its bargain as to all of [the] restrictive covenants." The judge declined ADP's request for attorney's fees since Hopper had only committed one "insubstantial" violation. An August 30, 2017 order memorialized the court's rulings.

C.

In May 2010, ADP hired defendant Anthony Karamitas as a sales trainee in the major account sales division. Karamitas signed an NDA that prevented him, for a period of twelve months after terminating his employment, from

soliciting ADP's actual or prospective clients he had contact with while working there, and disclosing ADP's confidential information or trade secrets.

After several months, Karamitas was promoted to major accounts district manager. In that role, he sold ADP's human resources software to employers with fifty to ninety-nine employees in certain areas of Georgia. Two years later, Karamitas was promoted to comprehensive services district manager in the major accounts division, where he sold ADP's services to employers with 50 to 149 employees. Karamitas had access to approximately 2000 ADP customer accounts.

Karamitas met his sales targets and accepted stock option incentives from 2011 to 2014. Each time he accepted the stock options, he also was required to assent to the "click-wrap" RCAs. Those RCAs were identical to those at issue in Kusins and Hopper.

After resigning from ADP in 2015, Karamitas worked in a position that was not similar to his prior employment. However, six months later, Karamitas joined USG as a strategic development manager, selling products and services to companies in Georgia with 200 to 500 employees. Karamitas testified that the products he sold for USG were similar to those he sold at ADP. He further conceded that he did not go through any type of training period at USG because he "knew the industry well."

22

Following Karamitas's resignation from ADP, the company sent him a letter reminding him of his obligations under the NDA and RCAs, and requesting information about his employment with USG. Through counsel, Karamitas responded to ADP "disavowing any obligation on his part to comply with the restrictive covenants."

ADP filed a complaint and an order to show cause, requesting a preliminary injunction to enjoin Karamitas from violating the NDA and RCAs, pending disposition of the litigation. In opposition, Karamitas submitted a certification conceding that he had unsuccessfully solicited at least one ADP client while at USG. The judge granted ADP's request for temporary restraints and enjoined Karamitas, during the pending litigation, from: (1) soliciting any actual or prospective ADP client he had contact with while employed by ADP; (2) using or disclosing any of ADP's confidential or proprietary information at any time; and (3) interfering in any way with any contract or client relationship of ADP he knew about through his prior employment with the company.

Following the completion of discovery, the parties filed cross-motions for summary judgment. ADP contended that Karamitas breached the terms of the NDA and RCAs by soliciting its actual and prospective clients, competing in the same market as ADP while employed by USG, and divulging ADP's confidential and proprietary pricing information.

23                                                              A-4664-16T1

In support of its motion, ADP offered the deposition testimony of Denise Biehl. She stated she and Karamitas had worked collaboratively to sell business process outsourcing services. Biehl explained ADP offered "unique" training to its employees, where they learned how to sell "the ADP Way." She explained ADP was recognized in the industry for its training and that Karamitas would have received the same "unique" training.

After Karamitas became employed at USG, he began to solicit several of ADP's clients, which Biehl explained had a "direct impact on the market that [she] s[old] to." She said Karamitas had successfully poached ADP's business

> [b]ecause of his experience selling products that are similar to the ones he's selling now, because he has knowledge of how [ADP's] service model works, [how ADP's] implementation model works, and not just around technology, but [ADP's] comprehensive shared service models.

Biehl stated she learned from ADP's clients that Karamitas was soliciting them; she also testified that Karamitas was soliciting numerous prospective clients. Moreover, ADP's clients and its sales associates informed Biehl that Karamitas had discussed confidential information with them, including: ADP's "fire protection," its HR "vulnerabilities," ADP's "ability to track certain data points," and ADP's "service model." She had heard that Karamitas told prospective clients that ADP's "HR system would not be able to track . . . data . . . in the way [the clients] would like to do it."

24

The judge found that, although the RCAs were enforceable "click-wrap" agreements that Karamitas assented to when he accepted his stock option incentives, the non-solicitation provisions in the 2013 and 2014 RCAs prohibiting the solicitation of any actual or prospective ADP client were overly broad and unenforceable. The judge found the non-solicitation provisions in the initial NDA and the 2011 and 2012 RCAs were reasonable because those provisions only prohibited Karamitas from soliciting ADP clients in the Georgia region that he had worked in while employed by ADP. Accordingly, the judge concluded that "rather than blue-penciling the problematic 2014 [RCA] non-solicitation provision, [he would] hold [Karamitas] to the previous non-solicitation clause, which he clearly signed and has conceded is reasonable."

The judge then addressed the alleged breaches under the terms of the enforceable 2011 and 2012 non-solicitation clauses. He found Karamitas had only solicited one client, which he had conceded. As for the remaining clients that ADP alleged Karamitas attempted to solicit, the judge found either an absence of proof, or that the solicitations did not violate the non-solicitation clauses in the NDA or the 2011 and 2012 RCAs.

With regard to the alleged violation of the non-compete clause, the judge found that Karamitas worked in a different "market share" at USG, because he

was selling to employers with 200 to 500 employees, whereas at ADP he sold to employers with less than 150 employees. Therefore, the judge blue-penciled the term "territory" in the non-compete provisions to include the market share in which Karamitas sold while at ADP. The judge found Karamitas had not breached the blue-penciled non-compete provision. Finally, in the August 30, 2017 order, the judge denied ADP's claims for inevitable disclosure, breach of the duty of loyalty, unfair competition, and attorney's fees.

D.

In April 2006, ADP hired defendant Nick LeNoble as a sales trainee in the small business sales division, which sold products to clients with less than fifty employees. Upon his hiring, LeNoble signed a SRA, prohibiting him from soliciting any of ADP's clients, or bona fide prospective clients, within a seventy-five mile radius of the territory he covered at ADP during the year prior to his termination. He was also prohibited from disclosing any confidential information learned during his employment.

LeNoble received several promotions over the next few years. He served as district manager, and senior district manager for the Madison, Wisconsin area. He then became sales manager for the Milwaukee area, and then a senior sales manager for the greater metropolitan Chicago area,

covering the city's northwest suburbs, though not the city itself. In 2015, ADP promoted him to senior sales manager of the "CPA Centric team," a group tasked with obtaining referrals for potential clients from accountants and bank contacts, covering the same area just outside the city of Chicago.

During his time at ADP, LeNoble met the incentive stock award requirements in 2008 and in 2010 to 2015, accepted those stock awards, and agreed to seven RCAs. Like with the other defendants, it is the 2014 RCA that is at issue before us.[11]

LeNoble terminated his employment with ADP in 2016, and began working for USG the following week. As a strategic development manager at USG, he sold the same payroll and human resources products and services that he had at ADP and did so in a partially coincident geographical territory — all of Illinois, except Cook and Lake counties. However, his coverage area at USG extended to a different customer base — employers with 200 to 500 employees.

Although LeNoble had spent his entire tenure at ADP within the small business sales division, ADP executives testified at their depositions that the

---

[11] The 2015 RCA agreed to by LeNoble did not differ from the 2014 iteration other than some minor wording changes not relevant to our review.

information gained from selling to companies with fewer than fifty employees at ADP could be used in selling to employers with 200 to 500 employees

Additionally, during LeNoble's employment at ADP, he was privy to confidential information about ADP's clients through his access to the Salesforce database,[12] which covered not only his own clients, but also those of the sales representatives under his management. He also became familiar with the company's product pricing, profit margins, and the details of many of its sales campaigns meant to compete with other payroll firms.

LeNoble attended seminars addressing new products and sales strategies, which featured presentations from multiple ADP business units. Moreover, LeNoble himself conducted training sessions with other sales representatives, including crafting responses to customer concerns with ADP products.

---

[12] An ADP executive described the Salesforce database as follows:

> Salesforce is our customer database. . . . [T]his is where we house all of our information on our clients and our prospective clients. It's essentially how our sales associates manage their business, manage their territory. It includes everything from . . . [the] name of the company to the address, number of employees, who their current provider is. . . . Not only the competitive provider, but just the history of what happened within . . . that account. So you can see . . . all the transactions that might have taken place from an activity standpoint and what the result of that activity was within that account.

LeNoble acknowledged that, during his first year at USG, he had successfully solicited business from several existing ADP clients, and from prospective clients that ADP was also actively soliciting. All of the companies were located within the greater Chicago area that LeNoble had covered at ADP.

LeNoble testified he sent marketing emails to potential clients he believed were using ADP's products or services. In one communication, LeNoble advised: "After spending [ten] years with ADP myself, I learned of some really great differences in the market place about [USG]." Moreover, he discussed his experience at ADP with a USG coworker in May 2016, stating in an email: "I will tell you that service [at ADP] has not changed. They are still throwing unqualified people into the mix and under training them then putting these undertrained people client facing. They are also moving specialists off of client accounts quickly so it feels like a revolving door."

Following discovery, LeNoble and ADP filed cross-motions for summary judgment. Prior to addressing whether LeNoble breached the SRA and RCA, the trial judge observed in a written opinion on January 24, 2018, that ADP had a legitimate interest in protecting its confidential information and client relationships. However, despite this, the judge concluded that the RCAs were broader than required to protect those interests. He recounted that

29

LeNoble had spent his entire tenure with ADP in a division responsible for selling only to customers with fewer than fifty employees. The judge concluded the evidence ADP presented failed to establish that LeNoble had any relationships with larger customers like those he currently dealt with at USG or had access to the specific confidential client information required to develop such relationships.

Nonetheless, because ADP did have some legitimate interests warranting protection, the judge determined, as a matter of equity, the RCAs should be blue-penciled to narrow their restrictions to protect the kind of confidential information LeNoble had gained from ADP. In particular, he concluded that the non-competition clauses in the RCAs should be limited to his ADP territory area, the northwest Chicago suburbs, and to employers with fewer than fifty employees. The non-solicitation clauses, meanwhile, would be limited to prevent LeNoble from soliciting, for one year following his termination from ADP, any of ADP's clients with fewer than fifty employees, any of its clients whose business he had actively solicited within the two years preceding his departure, and any of its prospective clients with fewer than fifty employees that LeNoble had acquired confidential information about while working for ADP.

A-4664-16T1

The judge dismissed the breach of the duty of loyalty and unfair competition claims, finding that ADP had failed to support its allegations. The judge also denied ADP's request for counsel fees.

E.

ADP hired defendant Michael DeMarco in July 2010 as a district manager in the Austin, Texas area for its small business sales division. DeMarco's clients were companies comprised of between one and forty-nine employees.

DeMarco signed both an SRA and NDA upon his hiring. Like the other defendants' initial SRAs, DeMarco's agreement included equivalent nondisclosure requirements. He was prohibited for one year from soliciting any of ADP's clients, or bona fide prospective clients, with which he had been "involved or exposed," but only in the territory he had covered during the two-year period prior to his resignation.

After meeting his sales goals from 2012 through 2014, DeMarco accepted the opportunity to participate in the stock award program and, subsequently, entered into RCAs in each of those years. DeMarco's 2014 RCA is the same as that executed by the other defendants.

DeMarco was promoted in 2012 and, for the remainder of his tenure, served as a core market representative in the major accounts division, which

31

handled clients with 50 to 1000 employees. He was specifically responsible for selling the company's payroll and tax processing services to entities with 50 to 125 employees.

During his employment, ADP provided DeMarco with training on the products and services he sold, including its payroll processing software and an understanding of benefits administration. An ADP executive testified DeMarco was privy to contact and background information for his own clients and any prospective clients within his region through the company's Salesforce database, and had access to pricing and marketing strategies, internal sales data, and information about future products and services. The supervisor also noted that as a former ADP employee, DeMarco possessed a unique level of credibility if he pointed out any shortcomings in ADP's products or services when soliciting a potential client for a new employer.

DeMarco left ADP and began working for USG in 2015. As a strategic development manager, DeMarco was responsible for selling the same kind of products and services as he had at ADP in an area that included Austin, but also spread to other parts of central Texas, New Mexico, and parts of Missouri. He handled a somewhat different customer base — companies with 200 to 500 employees — than he had at ADP. He was later promoted and became

responsible for employers with 500 to 1500 employees in central Texas, again including Austin.

DeMarco acknowledged at his deposition that, during his first year at USG, he successfully acquired four of ADP's existing clients and one prospective client he had previously solicited while working at ADP. In fact, in pursuing and securing the prospective client's business for USG, DeMarco dealt with at least one person he had met while seeking that client's business for ADP.

DeMarco also conceded that another client's representative contacted him after his move to USG, believing he was still working for ADP. DeMarco explained his change in employment, but added her to his contact list, and eventually invited her to a USG presentation. Soon after the presentation, the representative sent him an email, asking:

> Since we have ADP now, and you know the features of the ADP . . . product that we are considering, I'd like your objective look at how Ultimate Software compares. Of essential importance to us is that you can accommodate our needs globally for time off tracking. I also want to know your implementation expertise and customer service following implementation. Will want references that have gone ADP to Ultimate.

A-4664-16T1

DeMarco subsequently obtained that client's business. As a result of losing that client, DeMarco's former ADP supervisor testified that the revenue derived from that client dropped from $165,213.23 in 2016 to $650.82 in 2017.

The parties filed competing summary judgment motions. As he had in Kusins, the judge determined in an April 18, 2018 order that the RCAs were anticompetitive and, therefore, unenforceable. Although he found ADP had identified legitimate interests in protecting its confidential information, he reasoned that protection was already afforded to all employees by the SRAs and NDAs signed upon their hiring. Moreover, he found that every ADP sales representative, regardless of his or her rank in the company, was exposed to the same confidential information.

The judge concluded that DeMarco had violated his SRA and NDA by soliciting a prospective client following his resignation from ADP, but denied any relief under those agreements because ADP had not shown damages sufficient to justify a monetary award. The judge also dismissed the claims of breach of loyalty and unfair competition for ADP's failure to support its allegations. ADP's applications for counsel fees and injunctive relief were denied.

Despite his ruling, the judge commented that if the RCAs were enforceable, they nevertheless required blue-penciling. He would limit the

non-solicitation provision to the geographical territory DeMarco serviced while at ADP and to customers with no more than 150 employees.

F.

Defendant Daniel Hobaica began at ADP in 2008 as a sales associate in the small business services division in Arizona, soliciting business from companies with one to forty-nine employees. At the time of his hiring, Hobaica signed an NDA similar to the initial non-disclosure and non-solicitation provisions already discussed. He was specifically prohibited, for one year, from soliciting any ADP clients he was involved with during the two-year period prior to his resignation.

Hobaica was promoted numerous times within the division before being moved to the major account services division. In major accounts, he served first as a business process outsourcing district manager, handling clients with 50 to 150 employees, and then as upmarket district manager, managing clients with 150 to 999 employees. He spent his final two years at ADP in the upmarket district position, selling ADP's payroll and human resources products and services to an area covering about one third of Arizona.

Hobaica received several weeks of training during his first year at ADP and additional training throughout his employment. He attended meetings with other sales representatives, where they shared confidential information

A-4664-16T1

regarding the company's new products, sales strategies, and prospective clients; he also had access to the Salesforce database.

In a certification, Hobaica's former supervisor explained the insight sales representatives have into ADP's products and services, such as, their strengths and weaknesses, how the company sells them, how they differ from competitors, their pricing models and costs, and improvements to current products or products in development. Further, the supervisor certified that a former ADP employee "will know a significant amount of confidential information about ADP and will be able to tailor his or her proposal" to an ADP client without disclosing he or she was a former ADP employee.

During his time at ADP, Hobaica met the incentive stock award requirements in 2010-2012, 2014, and 2015, accepted those stock awards, and agreed to five RCAs.

Hobaica resigned from ADP in 2016 and began working at USG as a strategic development manager, selling to companies with 200 to 500 employees in an area covering his prior ADP territory of Arizona, as well as Nevada, Hawaii, and Alaska. At his deposition, Hobaica acknowledged selling the same sort of products and services at USG as he had at ADP, and to competing with his former employer for prospective clients. In his first year,

36

Hobaica admitted he acquired two of ADP's existing clients for USG, and solicited another, whose representatives he met while still working for ADP.

In considering the parties' cross-motions for summary judgment, the trial judge made similar determinations as he had in DeMarco and Kusins. He found the RCAs were anticompetitive and unenforceable. He also determined Hobaica had breached the NDA by soliciting actual and prospective ADP clients, but ADP had failed to support a claim for relief. However, the judge advised that if the RCAs were enforceable, he would blue-pencil them in accordance with his determination in DeMarco — limiting the non-solicitation provisions only to the geographical territory and market segment Hobaica serviced while at ADP. The remaining claims were dismissed under the April 23, 2018 order.

## II.

On appeal, ADP challenges the judge's conclusion in Kusins, DeMarco, and Hobaica that the RCAs were anti-competitive and therefore unenforceable. ADP also asserts both judges' blue-penciling of the RCAs was excessive, unreasonable, and inconsistent. Finally, ADP contends the judges erred in granting defendants summary judgment on its claims for breach of duty of loyalty and unfair competition, and that it was entitled to counsel fees and costs.

A-4664-16T1

We review a summary judgment order de novo, applying the same standard used by the trial court. Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014). We must determine whether, viewing the facts in the light most favorable to the non-moving party, the moving party has demonstrated there are no genuine disputes as to any material facts and they are entitled to judgment as a matter of law. R. 4:46-2(c); Davis, 219 N.J. at 406; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

A.

For more than a century, our courts have considered, and validated, contractual restraints against post-employment competition. See Mandeville v. Harman, 42 N.J. Eq., 185, 189-90 (Ch. 1886) (holding a non-compete agreement is valid if it is reasonable, provides fair protection to the employer, and does not interfere with the interests of the public). However, during that time, New Jersey generally held that if a noncompetitive agreement was deemed overly broad, it was struck as void per se. See, e.g., Solari Indus., Inc. v. Malady, 55 N.J. 571, 583 (1970).

In its landmark Solari decision, the Supreme Court changed that policy to permit "the total or partial enforcement of noncompetitive agreements to the extent reasonable under the circumstances." Id. at 585. Under Solari, a restrictive covenant is deemed enforceable if it "simply protects the legitimate

A-4664-16T1

interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public," in addition to the particular restrictions being reasonable in duration, area, and scope of activity. Id. at 576, 581-82; see also Coskey's Television & Radio Sales & Serv., Inc. v. Foti, 253 N.J. Super. 626, 634 (App. Div. 1992). The employer bears the burden of establishing the agreement's enforceability. Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 638 (1988). Moreover, a court's ultimate determination requires a "fact-sensitive" analysis to the circumstances of each case. Platinum Mgmt., Inc. v. Dahms, 285 N.J. Super. 274, 294 (Law Div. 1995).

Our Supreme Court has instructed that a determination of the enforceability of a restrictive covenant requires a court to balance the employer's need to protect its legitimate interests against the hardship placed on the employee by the agreement. Ingersoll-Rand Co., 110 N.J. at 634-35. An employer's legitimate interests include the protection of trade secrets or proprietary information, as well as customer relationships. Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 33 (1971). It also includes the protection of information that, while not a trade secret or proprietary, is nonetheless "highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which the

employee has been 'exposed' and 'enriched' solely due to his employment." Ingersoll-Rand Co., 110 N.J. at 638.

With that said, an employer does not have a legitimate interest in simply preventing competition. See Whitmyer Bros., 58 N.J. at 635. Consequently, "[c]ourts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee." Ingersoll-Rand Co., 110 N.J. at 635. Indeed, the "knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person," and the employee may "use those skills in any business or profession he may choose, including a competitive business with his former employer." Ibid.

In weighing the hardship placed on an employee by an RCA, a court must determine "the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee." More, 183 N.J. at 59. Therefore, "the geographic, temporal, and subject-matter restrictions of an otherwise enforceable [RCA] will be enforced only to the extent reasonably necessary to protect the employer's legitimate business interests." Campbell Soup Co. v. Desatnick, 58 F.Supp.2d 477, 489 (D.N.J. 1999) (citing Foti, 253 N.J. Super. at 634).

40

After a court analyzes the Solari/Whitmyer factors, the RCA may be disregarded entirely, or given "total or partial enforcement to the extent reasonable under the circumstances." Whitmyer, 58 N.J. at 32 (citing Solari, 55 N.J. at 585). As noted, courts have discretion to limit or "blue-pencil" the application of an RCA in terms of the geographical area, period of enforceability, and scope of prohibited activity. Solari, 55 N.J. at 585; Campbell Soup Co., 58 F.Supp.2d at 489.

One trial judge found the RCAs to be anti-competitive and, therefore, unenforceable. Although the other judge did not specifically address whether the RCAs were unreasonable restraints on trade, he did state in Karamitas: "[T]here is, of course, a very protectable interest in preserving the customer information and relationships that . . . Karamitas fostered while working at ADP. And the [c]ourt's already enforced that and it's continuing to enforce it." From this statement, we infer the second judge accepted ADP's assertion that the RCAs were necessary to protect a legitimate business interest. This inference is bolstered by the judge's determination that the non-compete and non-solicitation clauses in the RCAs were overly broad, necessitating a blue-penciling of their application to Hopper's, Karamitas's, and LeNoble's particular circumstances.

41

While these cases were pending on appeal, ADP litigated numerous matters in the federal district courts in New Jersey and elsewhere. Like the orders under review here, the results were inconsistent. See ADP, LLC v. Lynch, Nos. 2:16-01053, 2:16-01111, 2016 U.S. Dist. LEXIS 85636, at *22-*24 (D.N.J. June 30, 2016), aff'd, 678 F. App'x 77, 80 (3d Cir. 2017) (finding the RCAs were reasonable after blue-penciling the requirement that defendants were prevented from soliciting potential ADP clients, but only to the extent that they gained knowledge of those clients through their employment with ADP); ADP, LLC v. Jacobs, No. 2:15-3710, 2015 U.S. Dist. LEXIS 103207, at *11-*12 (D.N.J. Aug. 5, 2015) (granting ADP a preliminary injunction after blue-penciling the RCA to prevent defendant from soliciting potential ADP clients that he gained knowledge of while employed with ADP); ADP, LLC v. Manchir, No. M2016-02541-COA-R3-CV, 2017 Tenn. App. LEXIS 737, at *14, *22-*24 (Tenn. Ct. App. Nov. 8, 2017) (affirming that the RCA was narrowly tailored, "not merely a restraint on general competition," and, therefore, reasonable and enforceable under New Jersey law).

Earlier this year, the Third Circuit considered ADP's 2014 and 2015 RCAs, concluding that, although the covenants were overbroad, the RCAs were not unenforceable in their entirety. ADP, LLC v. Rafferty, 923 F.3d 113 (3d Cir. 2019). In applying the Solari criteria, the Third Circuit found ADP

had "a legitimate business interest in imposing the RCA on [its successful salespeople], and the RCA's heightened restrictive covenants, over and above those in the SRA and NDA, are reflective of the greater damage those employees could inflict on ADP upon their departure." Id. at 123. We agree.

Here, multiple ADP supervisors and managers testified to the specialized training, leadership development programs, sales development, and skills seminars provided to the high-performing employees. Defendants themselves taught workshops and training programs. The top-tier employees were also granted access to specialized software, databases, and current and prospective client lists and information. The record reflects ADP spends significant time, energy and money in soliciting clients and developing client relationships and good will.

Defendants do not dispute the depth, and extent, of the customer relationships they were trained to develop and did develop while at ADP. It cannot be a coincidence their subsequent employment was with a direct competitor of ADP. It is their expertise at developing and closing sales, and their knowledge of ADP's strategies and pricing information that made them attractive and valuable to a competitor.

ADP's business is providing services to its clients. Protecting its customer relationships is paramount to its success. We are satisfied ADP has

43

presented ample evidence that acquiring and retaining its customers requires "a significant investment of time, effort and money which is worthy of protection." A.T. Hudson & Co. v. Donovan, 216 N.J. Super. 426, 434 (App. Div. 1987). We conclude that ADP has demonstrated a legitimate and protectable interest in its customer relationships sufficient to justify enforcement of its RCA.

Defendants argue that even if on its face the RCA protects a legitimate business purpose, that purpose is abrogated by its imposition only on a certain group of employees. Agreeing to the RCA only entitled an employee to receive a stock award; it did not affect the status of one's employment. We are unpersuaded.

The stock award incentive program was only offered to ADP's top-performing employees. It was packaged as an incentive to meet or exceed certain sales targets and given as an award for doing so. It reflects a merit or bonus system present in most business settings. These employees have excelled at creating or continuing ADP's customer relationships, which ADP seeks to protect. To be successful in their sales position, defendants must have demonstrated extensive client contact. Therefore, defendants have a greater ability than less successful employees to cause harm to ADP's customer relationships upon leaving the company and joining a competitor.

A-4664-16T1

ADP representatives described the harm sustained to its relationships with particular customers resulting from defendants' actions post-resignation. They provided specific instances of clients drastically reducing their business with ADP or terminating its services altogether. Defendants themselves attested to the advantages they had in their new jobs because of their ADP training and specialized information attained during their prior employment. LeNoble discussed the weaknesses of ADP's products with ADP's clients he was soliciting for USG. Karamitas admitted he did not need any training upon joining USG "[b]ecause [he] knew the industry well."

The imposition of the RCA on only high-level employees does not change our determination that the covenant served ADP's purpose of protecting its business interest – its customer relationships. As demonstrated by defendants, the top-performing employees have the greatest potential to damage ADP's relationship with its current and prospective clients.

We now turn to the analysis of whether ADP's need to protect its business interests is outweighed by any hardship the RCAs impose on defendants as former employees.[13] It cannot be disputed the RCAs impose a

_____

[13] Defendants do not challenge the RCA's one-year temporal limitation; therefore, other than confirming it is a reasonable term, we need not address it further. See, e.g., Laidlaw, Inc. v. Student Transp. of Am. Inc., 20 F.Supp.2d 727, 761 (D.N.J. 1998) (holding a one-year restriction valid).

degree of hardship on employees who leave ADP and work in the same field for another company. We must determine whether that hardship is undue.

Under the 2014 RCA, an ADP employee is prevented from soliciting business from <u>all</u> of ADP's 620,000 existing clients, not just those the employee had substantial dealings with or acquired knowledge about while at ADP. We find this unreasonable. That restrictive language is untenable as an ADP employee could not possibly know all of ADP's actual clients. Therefore, it is necessary to blue-pencil the RCA to achieve the balance of protecting ADP's interests against the hardship it imposes on former employees.

We conclude that a non-solicitation clause and non-compete clause may prevent an employee from having any dealings with existing ADP clients that the employee was actively involved with or whose names the employee learned during his or her employment.

The RCA also prohibits a former employee from soliciting any prospective client that ADP "reasonably expects" to provide business to within the two-year period following the employee's departure. The non-compete clause blocks a former employee from working with a competing business and selling the same services in the geographic area in which they worked while at ADP.

A-4664-16T1

In Rafferty, ADP conceded before the Third Circuit that the RCA's non-solicitation clause pertaining to prospective clients was overbroad and should be blue-penciled. 923 F.3d at 126. Here, ADP has agreed that the non-solicitation clause should only be enforced as to prospective clients that defendants had knowledge of during their ADP employment.

We agree that the RCA's non-solicitation clause regarding prospective clients is overly broad and places an undue hardship on ADP's former employees. Due to the breadth of ADP's worldwide reach, any company defendants approach might be a potential "prospective" ADP client. We cannot envision any practical manner in which defendants could conduct business without offending this provision. That is an unreasonable burden and undue hardship, and therefore subject to blue-penciling. We conclude that the clause pertaining to prospective clients may only be enforced against a former employee who gained knowledge of a potential client while at ADP and directly or indirectly solicits that client after leaving and working for a competitor.

We also note that because defendants all voluntarily left ADP to join a direct competitor, they cannot assert their termination as a hardship for our consideration. See More, 183 N.J. at 59 ("If the employee terminates the

relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play.").

Defendants do not contest the RCA's geographical limitation. As our courts have stated, the inclusion of a geographic restriction is common and a reasonable component of an RCA. Platinum Mgmt., Inc., 285 N.J. Super. at 299. However, in Karamitas, LeNoble, DeMarco, and Hobaica, the judge loosened the covenant's restriction by blue-penciling the geographical limitation in these clauses to also include a market segment. Under that modification, a former employee could only violate the RCA if he provided similar services for his new employer or solicited ADP clients in both his former ADP geographical territory and in the market segment he serviced while at ADP.

We cannot discern any rationale in the record to blue-pencil a market segment component into the RCA. There is no evidence that the specialized training, information, or strategic client skills defendants obtained at ADP differed according to the number of employees in the companies they serviced. The customer relationships ADP seeks to protect are the same, regardless of how many employees the client might have.

Defendants have not demonstrated a specific hardship requiring a modification to the territorial clause. Therefore, we reverse the rulings in

Karamitas, LeNoble, Demarco, and Hobaica that blue-penciled a market segment component into the RCA. The portions of the non-compete and non-solicitation clauses that prohibit defendants from providing services for a competitor or soliciting ADP's clients within the same territory they worked in at ADP are enforceable.

In analyzing the final Solari factor, we must consider whether enforcement of the RCA causes harm to the public. Defendants have not argued the covenants have any injurious effect on the public and we discern no public component to the RCA. As our courts have previously stated, a geographical restriction on a former employee "impinges only slightly on the public interest." Mailman, Ross, Toyes & Shapiro v. Edelson, 183 N.J. Super. 434, 442 (1982).

Therefore, we conclude that the RCA is not unenforceable per se, but is subject to blue-penciling regarding both the solicitation of prospective ADP clients and the solicitation of ADP's actual clients to require that defendants were actively involved with or had knowledge of these clients while at ADP.

III.

Having found the RCAs reasonable as blue-penciled, we consider the covenant's application to each defendant. In some instances, because there is a complete factual record before us, we need not remand for a determination of

49

whether the individual defendant breached the RCA. Indeed, it cannot be disputed that all of the defendants developed client relationships at ADP that they have exploited following their employment at USG.

A.

For the reasons already stated, we reverse the judge's conclusion in Kusins that the RCA was anticompetitive and unenforceable. In applying our blue-penciled modifications to the non-solicitation and non-compete clauses, it is clear Kusins breached both of those provisions in his employment with USG. He solicited clients he had worked with at ADP, sought business from several of ADP's prospective clients that he was in contact with while at ADP, he encouraged his USG co-workers to solicit ADP's clients, and at USG he sold services in three of the states he had operated in at ADP.[14]

Although the judge rejected the RCA's enforceability, he found Kusins breached the initial SRA's non-solicitation clause, entitling ADP to an equitable tolling of the agreement. Kusins was enjoined from soliciting or communicating "with any ADP actual or prospective client known to [him] while he was employed by ADP" for one year from the court's order. During that time, Kusins was also prohibited from soliciting or recruiting any of

---

[14] Kusins also breached the non-use provision each time he discussed ADP's clients with his colleagues at USG.

ADP's employees, and using or disclosing "ADP's confidential, proprietary, or trade secret business information or property."

Although we disagree with the judge's rulings on the RCA's enforceability, we are satisfied the injunctive relief afforded ADP was reasonable and fulfilled the goals of the RCA. The judge did not abuse its discretion in exercising its equitable powers. It is not clear, however, whether Kusins complied with the judge's restrictions. On remand, the trial court must determine whether Kusins complied with the prior injunctive order. If not, the court shall consider a tolling period as permitted under the RCA.

Because we have found the RCA is enforceable, ADP is also entitled to assert a claim for attorney's fees and costs. N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 570 (1999) (explaining parties may agree to contractual fee shifting provisions). Therefore, we remand Kusins to the trial court for a determination of whether ADP "substantially prevail[ed]" in the litigation and if a counsel fee award is appropriate.

Kusins filed a cross-appeal asserting the judge erred in equitably tolling the provisions of the SRA. In light of our decision affirming the judge's remedy, the cross-appeal is denied.

ADP alleges that Hopper's successful solicitation of four ADP clients and attempted solicitation of an ADP employee, after beginning his employment at USG, violated the non-solicitation clause of the RCA.[15] The judge found the non-solicitation clause regarding ADP's actual clients was overbroad and blue-penciled a geographic restriction into the provision, forbidding the solicitation of ADP's clients only within the territory Hopper had served while at ADP. Because Hopper was working at USG in a different territory than he had at ADP, the judge found he had not breached the blue-penciled RCA.

The judge further concluded that Hopper had improperly solicited an ADP employee, but termed it a "minimal violation." He therefore denied a tolling period and counsel fees. ADP's remaining claims for inevitable disclosure of its protected information, breach of the duty of loyalty, and unfair competition were dismissed on summary judgment.

As previously discussed, prohibiting the solicitation of ADP's actual clients is a reasonable legitimate business interest. The RCA's overriding purpose is the protection of ADP's existing client relationships. It is of no

---

[15] Because Hopper worked at USG in a different territory then he had serviced while at ADP, he did not violate the covenant's non-compete clause.

import that the ADP clients Hopper solicited were not located in his previous geographic territory. The RCA seeks to protect existing customer relationships, and, as we have established, is enforceable. A geographic limitation is not necessary. As a result, Hopper breached the RCA in soliciting ADP's current clients and employees.

The RCA's one-year period has long expired. Therefore, on remand, the trial judge should determine the appropriate tolling period for Hopper's violations of the covenant. The judge must also consider ADP's application for counsel fees.

C.

In response to ADP's order to show cause and request for preliminary injunction, Karamitas conceded he had attempted to solicit at least one client after starting work at USG, but was unsuccessful. ADP's request for temporary restraints was granted, enjoining Karamitas, during the pending litigation, from: (1) soliciting any actual or prospective ADP client that he had contact with while employed by ADP; (2) using or disclosing any of ADP's confidential or proprietary information at any time; and (3) interfering in any way with any ADP contract or client relationship that he gained knowledge of through his prior employment with ADP.

53

As in Hopper, the judge found the non-solicitation clause of the RCA regarding actual ADP clients to be overly broad. However, instead of blue-penciling the provision, as he had done earlier that day in his Hopper ruling, the judge decided to "hold [Karamitas] to the previous non-solicitation clause" that he signed in the 2011 and 2012 RCAs. The judge found these clauses required ADP to show Karamitas was involved with the clients while at ADP. As we have found the 2014 RCA non-solicitation clause to be enforceable, we reverse that portion of the judge's ruling.

Karamitas admitted to one violation of the RCA. ADP presented evidence of at least a dozen more solicitations of its actual clients. However, because the judge assessed the factual evidence under the 2011 and 2012 RCA's non-solicitation clause, he found there was either an absence of proof or the solicitations did not violate those earlier agreements. We must, therefore, remand the issue of whether Karamitas breached the 2014 RCA by soliciting ADP's actual clients after joining USG.

Karamitas also breached the non-compete clause as he provided services to clients at USG in the same territory he serviced while at ADP. As we have stated, it was unreasonable, and factually unsupported, to blue-pencil a market segment into the territorial restriction. The specialized training and confidential information Karamitas acquired from ADP was useful to him in

54

his dealings with any potential client, regardless of the company's number of employees. The non-compete provision was intended to protect all of ADP's customer relationships in the geographical area in which its former employees had worked.

Therefore, Karamitas breached both the RCA's non-solicitation and non-compete clauses. On remand, the trial judge must determine the proper remedy for these violations. The judge must also consider ADP's application for counsel fees.

D.

LeNoble began working at USG the week after he left ADP. He acknowledged during his deposition that he had successfully solicited business from three of ADP's actual clients and two prospective clients that ADP was also soliciting. All of these clients were located within the territory LeNoble had serviced at ADP. Although acknowledging ADP had a legitimate interest in protecting its client relationships and confidential information, the judge blue-penciled both the non-solicitation and non-compete clauses to prohibit LeNoble only from working with businesses in his prior ADP territory <u>and</u> in the same market segment LeNoble worked in at ADP.

As we have found the market share component to be an unreasonable limitation, we reverse that aspect of the ruling. With the elimination of that

restriction, the record clearly reflects LeNoble breached both clauses at issue. He solicited actual ADP clients in the territory he worked in while at ADP, and he solicited prospective clients in his prior territory, despite knowing that ADP was also actively soliciting those clients.

Therefore, we remand to the trial court to craft the appropriate remedy for these breaches, applying the tolling period permitted under the RCA. The court shall also consider any counsel fee application.

E.

As stated, one judge found the RCAs to be anti-competitive as a restraint on trade and, therefore, unenforceable. In the alternative, he considered that the RCAs could be narrowly tailored to fit the legitimate interests ADP sought to protect. Therefore, in <u>DeMarco</u> and <u>Hobaica</u>, the judge blue-penciled the non-solicitation provision to limit it only to ADP's actual clients or prospective clients with whom DeMarco and Hobaica had contact at ADP and to the geographical territory and market segment that each defendant had serviced while at ADP. He concluded that the RCAs, as blue-penciled, had "no application to the facts of this case." In applying our determination of the RCA, we reverse that ruling.

DeMarco conceded that he acquired four of ADP's existing clients during his first year at USG and one prospective client who he had solicited

56                                                              A-4664-16T1

himself while he was at ADP. The clients were all located in the territory DeMarco serviced at ADP. Demarco admitted to selling the same products and services he sold at ADP. The facts are undisputed that DeMarco violated both the RCA's non-solicitation and non-compete clauses. We remand to the trial court to determine the appropriate remedy for the breaches and to consider ADP's counsel fee application.

F.

Upon commencing employment at USG, Hobaica successfully acquired two of ADP's existing clients and solicited another customer he had met while working at ADP. Hobaica admitted to selling the same type of products and services at USG as he had at ADP and working in some of the same geographical areas. He acknowledged he competes with ADP for prospective clients. The undisputed facts support a conclusion that Hobaica violated both provisions of the RCA. Therefore, we remand to the trial court to determine the appropriate remedy for the breaches and to consider ADP's counsel fee application.

IV.

Both judges granted summary judgment to defendants on ADP's claims of inevitable disclosure, breach of loyalty, and unfair competition. Because we have concluded each defendant violated the RCA, and ADP is entitled to

57

injunctive relief, ADP's inevitable disclosure doctrine is moot and we need not consider it.

We also affirm the summary judgment order dismissing the claims of breach of loyalty and unfair competition. Our Supreme Court has stated: "Loyalty from an employee to an employer consists of certain very basic and common sense obligations." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 302 (2001). "An employee must not . . . act contrary to the employer's interest" or "compete with his or her employer" during the period of employment. Ibid. (first citing Chernow v. Reyes, 239 N.J. Super. 201, 204 (App. Div. 1990); and then citing Cameco, Inc. v. Gedicke, 157 N.J. 504, 517-18 (1999)).

However, the duty does not necessarily cease when the employment relationship is terminated. See Walters, 167 N.J. at 302-03. Our Court has recognized that "an employee's taking of legally protected information from his or her employer, in order to seek a competitive advantage upon resignation, constitutes a breach of the duty of loyalty." Id. at 304.

None of the defendants took any physical documents from ADP when they resigned. Instead, ADP contends their knowledge of ADP's confidential information, gleaned while employed at ADP, should be enough to establish a breach of loyalty. We disagree. ADP has not identified any specific

disclosure of confidential information to support its claim. As noted earlier, the general knowledge gained by defendants while employed at ADP is not a protectable business interest and, without demonstrating that they improperly used that information, ADP is unable to establish a breach in their duty of loyalty.

In light of that conclusion, we also reject ADP's claim of unfair competition. This common law business tort is an "amorphous" area of law and is generally defined as the "misappropriation of one's property by another . . . which has some sort of commercial or pecuniary value." Duffy v. Charles Schwab & Co., 97 F.Supp.2d 592, 600 (D.N.J. 2000) (quoting N.J. Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc., 144 N.J. Super. 411, 427 (Ch. Div. 1976)).

In sum, we reverse the orders granting summary judgment. We blue-pencil the RCAs to prohibit the direct or indirect solicitation of ADP's actual clients defendants had substantial dealings with while at ADP or who defendants had knowledge of during their prior employment. We also blue-pencil the clauses to prevent the direct or indirect solicitation of ADP's prospective clients that a former employee gained knowledge of during his employment at ADP.

 A-4664-16T1

The geographical limitation in the non-compete clause is a reasonable restriction. A market segment restriction is not. Because ADP demonstrated a legitimate protectable business interest and the RCAs as blue-penciled did not impose an unreasonable hardship on defendants, the RCAs are enforceable. We are satisfied these blue-pencil modifications result in "narrowly tailored" provisions that "ensure the covenant is no broader than necessary" with respect to its duration, area, and scope of prohibited activities in order to "protect the employer's interests." More, 183 N.J. at 58-59.

We remand Karamitas to the trial court for a determination of whether he breached the 2014 RCA in soliciting actual ADP clients after joining USG. In all of the matters other than Kusins, we remand for a determination of the appropriate remedy for each defendant's breach of the RCA, including a tolling of the time limitations of the RCAs during the period of defendants' violations. The court in all six cases shall also consider the propriety of a counsel fee award commensurate with each defendant's violations.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION